**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 28, 2016**

# In the Court of Appeals of Georgia

A16A0986. IN THE INTEREST OF E. M. D., et al., children.

PETERSON, Judge.

The mother of four minor children, E. M. D., M. C. D., L. A. W., and M. O. W., appeals from a juvenile court order terminating her parental rights. The mother argues that the trial court lacked clear and convincing evidence to support its findings that (1) chronic, unrehabilitated substance abuse rendered her incapable of providing adequately for her children's needs; (2) the cause of her children's dependency is likely to continue; and (3) the continued dependency would cause serious physical, mental, emotional or moral harm to the children. Because the trial court's factual findings are insufficient to support its conclusion that a failure to terminate the mother's rights will cause or is likely to cause the children serious physical, mental, emotional, or moral harm, we reverse.

I.     Factual and procedural background

A.     Proceedings prior to termination hearing

In reviewing an order terminating parental rights, we view the evidence in the light most favorable to the juvenile court's findings. *See In the Interest of R. S.*, 287 Ga. App. 228, 228 (651 SE2d 156) (2007). So viewed, the evidence shows that on July 11, 2012, the juvenile court entered an order of shelter care regarding the children, placing the children in the custody of Glynn County Division of Family and Children Services (DFCS).[1] The following day, DFCS filed a petition alleging the children were deprived. A urinalysis testing form filed with the juvenile court indicates that the mother tested positive for cocaine that day and indicates that the mother reported having taken oxycodone and trazadone since her "last screen." On July 25, 2012, the juvenile court issued orders finding the children to be deprived and ordering them to remain in the temporary custody of DFCS. The order found that the mother, children, and the father of the two youngest children were living in a hotel room[2] kept "in deplorable conditions" and that a case worker found the children dirty,

_____

[1] At the time, the children were ages five months, 23 months, five years and eight years old.

[2] Although the court's orders appear to suggest that all four children were living in the hotel, a report from a Court Appointed Special Advocate (CASA), as

unfed, and with signs of abuse and neglect, such as a cigarette burn to the face of a child and severe diaper rash.[3] The court cited reports of neighbors that the children wandered the premises looking for food and were left unattended in the hotel room after midnight, and that the parents had been seen trying to obtain prescription drugs from other hotel residents.

In October 2012, the juvenile court entered orders incorporating a case plan submitted by DFCS, setting forth the items that must be "completed sufficiently to remove the risk" to the children before the mother could be permanently reunited with them. The plan required the mother to (1) complete a drug and alcohol assessment through Gateway Behavioral Health Services; (2) continue treatment based on Gateway's recommendations; (3) complete a psychological evaluation and follow the provider's recommendations; (4) undergo random monthly drug screenings and test negative at least six months in a row; (5) take prescribed psychiatric medications and communicate with her counselor regarding her mental health needs; (6) participate

---

well as testimony from the mother at the termination hearing, indicated that the two oldest children were staying with their maternal grandmother at the time. It is clear from the record, however, that all four children were taken into the State's care.

[3] A citizens' review panel that monitored the case credited the father's explanation of the cigarette burn as accidental.

in support group meetings; (7) agree to the release of treatment information to her DFCS case worker; (8) complete a domestic violence assessment and follow the provider's recommendations; (9) obtain and maintain a source of income and keep DFCS apprised of all job applications; (10) obtain and maintain stable, clean and safe housing appropriate for herself and the children; and (11) ensure the children have ongoing medical care with their pediatrician, actively asking questions about their medical care even while they are out of her custody. A separate notation in the case plan documents said that DFCS expected parents to pay child support and warned that failure to do so could be a ground for termination of parental rights, but the documents did not specify any particular amount of support that was required.

On July 30, 2013, the juvenile court granted DFCS's motion for an extension of the grant of temporary custody to the agency. The court found that the mother had gained employment and visited with the children but had not provided child support, maintained stable housing or completed drug treatment, and thus had not sufficiently complied with the case plan to allow reunification at that time.

On May 21, 2014, DFCS filed a motion asking the court to begin "transitional" unsupervised visits, including overnight and on weekends. The accompanying case worker report cited the mother's six months of clean drug screenings, completion of

4

inpatient residential drug treatment at Gateway,[4] success in securing housing and employment, and positive reports of the mother's interactions with the children during their stay in a group home. A motion for extension of the juvenile court's custody order filed by DFCS less than two weeks later said that the mother had made "great efforts towards the completion of the case plan" and been "very compliant" with it, but DFCS wanted to see how transitional visitation went before returning the children to the mother's custody.

But the CASA and guardian ad litem (GAL) learned of a May 17, 2014, arrest of the mother for possession of marijuana of less than an ounce and objected to the transitional visits. The GAL's report said that a co-defendant who had been in the same vehicle when the mother was arrested was charged with various offenses, including possession of cocaine with intent to distribute.[5] The report said the two

---

[4] The mother would go on to acknowledge at the termination hearing that, although she had been a patient at Gateway for 60 days, she was discharged without completing the inpatient program.

[5] According to an arrest warrant and accompanying affidavit filed with the court, marijuana was found underneath the mother's pocketbook, neither she nor her co-defendant claimed ownership of the drugs, and her co-defendant had equal access to them. The mother was released on bond three days after the arrest. A DFCS case worker testified at the termination hearing that when she confronted the mother about the arrest, the mother initially denied the arrest, but then admitted it. The worker testified that she was not aware of the disposition of the charges against the mother.

younger children's father was arrested that same day and charged with various offenses, including possession and use of drug related objects. Although the record does not reflect an explicit ruling on the motion for unsupervised visitation, the juvenile court ordered that the children remain in the custody of DFCS, saying that it would not be in the children's best interest to return home as the parents "still are using drugs, or involved with those who are," leading to their arrests and showing "a lack of stability which the children require." Consistent with the recommendations of a citizen panel that reviewed the case, the juvenile court in December 2014 suspended the mother's visitation privileges until she could achieve three consecutive months of clean drug screenings, and it suspended the father's visitation privileges altogether.

DFCS moved for termination of the parental rights of the mother – as well as all of the children's fathers – on March 20, 2015. The petition alleged that the children were dependent due to lack of parental control by the parents, citing the mother's "history of chronic unrehabilitated substance abuse," failure to pay child support and maintain a bond with the children over the previous six months, and

There is no evidence in the record indicating any disposition.

various shortcomings in completing the goals of her case plan. The juvenile court presided over a hearing on the termination motion on June 4, 2015.

B.    Termination hearing

1.    Employment, housing, and support

At the hearing, the court heard from the DFCS case worker who handled the children's case from August 2013 to February 2015, as well as the subsequent case worker, who remained on the matter at the time of the hearing. They spoke of the mother's progress on her case plan, including obtaining work and housing for the children. According to their testimony, the mother's employment during their tenure on the case included relatively brief stints at a convenience store and various restaurants. The current case worker testified that the mother informed her in March 2015 that the Steak & Shake restaurant where she had been working had closed. The mother reported cleaning houses thereafter but furnished no verification to the case worker. The current case worker testified that the mother had recently furnished a letter indicating that she had been hired at a Domino's Pizza but had been unable to furnish any pay stubs because she had not yet received one. The mother testified at the hearing that she expected to get her first pay check the following day.

The prior case worker testified that in October or November 2013 the mother provided a lease for a home she had rented, but the mother initially had insisted it was not ready for the children. The prior case worker said she made an unannounced visit to the home in January 2014 and found it was a three bedroom, two bath home that contained beds for the children and "looked ready." The mother hosted a supervised visit with the children at the home in March 2014. The current case worker testified that she had visited the mother's residence about a week before the termination hearing, and found it furnished with operational utilities. She testified that the mother had given her copies of a lease and a utility bill, although the mother was now renting it on a month-to-month basis.

The prior case worker testified that the mother's child support issue "was kind of confusing to me," in that the case worker understood that any parent with a child in state custody is supposed to pay some amount to DFCS as a form of support, but there was nothing specific about child support in the mother's case plan. The prior case worker testified that the mother occasionally gave her $25 toward support. She testified that she told the mother she needed to pay $25 per month, per child. The mother testified that the prior case worker never told her to pay anything, but acknowledged she had discussed child support with the current case worker. The

8

current case worker testified that child support was "not indicated in [the mother's] actual case plan specifically," but insisted the case plan does indicate that parents will have to pay some support and "the practice" is $25 per child, per month. She said the mother had paid $50 altogether since the current case worker was assigned to the case. In total, the current case worker testified that the mother had paid $325, and her arrears would be $3,350 assuming a payment requirement of $25 per month, per child.

### 2. Drug use

Regarding drug use, the prior case worker testified that the mother's drug screens had been negative "for a substantial period of time" before the worker took over the case in August 2013. The prior case worker testified that the mother was difficult to reach and would sometimes call toward the end of the month and bring up the topic of drug testing, prompting the case worker to remind her to go get tested. The prior case worker said that "kind of" resulted in testing that was not entirely random. The mother gave monthly negative drug screens from October 2013 through February 2014, from April through June 2014, and in December 2014. She missed screens in August and September 2013 and March, July and September through November 2014. The mother tested positive for amphetamines in August 2014, telling

9

the case worker that she was taking a diet pill that made the test positive. Beginning in January 2015, the mother tested positive for Suboxone,[6] despite telling the prior case worker that month that the only medication she was taking was Gabapenten. The current case worker testified that the mother tested positive for Suboxone in February 2015, but gave the case worker a prescription for the drug.[7] The current case worker considered a subsequent incident when the mother did not report for testing when summoned to do so, and only called back the following day, to be the equivalent of a positive test. A March 2015 drug screen was "diluted," which the current case worker testified meant that the mother tried to alter her sample "when it probably would have been positive." Screens in April, May and June 2015 were positive only for Suboxone.

The current case worker testified that she was concerned about the positive Suboxone screens, saying it was "a highly narcotic drug" that "could influence [the mother's] ability to parent." The current case worker testified that at the time of the hearing the mother was going to Gateway for regular mental health counseling,

---

[6] Suboxone is a drug used to treat addiction to narcotics by alleviating withdrawal symptoms and drug cravings.

[7] DFCS's attorney stipulated that the mother had a prescription for that drug.

10

relapse prevention and substance abuse counseling, as well as attending Alcoholics Anonymous meetings. The mother provided the case worker with logs showing her attendance at support group meetings beginning in March 2015. The current case worker testified that the mother previously had gone into residential substance abuse treatment at Gateway but was discharged.

A testing coordinator with the Glynn County Drug Court Treatment Center testified that her center also handled screening for dependency proceedings in Juvenile Court, including in this case. Although not offered by the State as an expert on Suboxone, the testing coordinator testified that a person who is prescribed Suboxone is not eligible for the county's Drug Court program, because it produces a "high" similar to other opioids if abused, makes it difficult for a person to think clearly, and produces severe withdrawal symptoms. The mother's lawyer objected to the testing coordinator's testimony on the ground that she had not been qualified to testify as a expert on Suboxone; the trial court overruled the objection, saying the witness had not gone beyond testimony on the Drug Court's policies.

The doctor who prescribed Suboxone to the mother also testified. The doctor testified that she is board certified in family medicine and has a certification from the federal Drug Enforcement Administration that permits her to prescribe Suboxone,

which requires completion of a training course and registration with the U.S. Secretary of Health and Human Services. The doctor testified as an expert over no objection by DFCS and has been prescribing Suboxone since 2004.

The doctor testified that the mother first came to her seeking treatment with Suboxone in February 2015, before DFCS sought termination. The mother reported a history of back pain resulting in prescriptions for opioids such as hydrocodone and oxycodone, on which she became dependent. Consistent with the doctor's written records, the doctor testified that the mother reported an ongoing problem with opiates for at least the previous three years and that she had taken oxycodone without a prescription three or four days before the visit. Those records also indicate the mother reported that she "takes around 90 mg of Oxycodone a day" and that she had snorted Roxicodone at some point in the past. The mother also reported that she had accessed Suboxone on at least one occasion before coming to see the doctor.

The doctor testified that Suboxone was the best option to treat the mother's opioid dependency because it alleviates cravings and withdrawal symptoms, reduces a risk of relapse compared to quitting "cold turkey," and creates little to no "high" or "euphoria," allowing patients to "just feel normal again." Patients may abuse Suboxone to get high, the doctor testified, but the current formulation, in which the

12

drug is administered as a film placed under the patient's tongue, makes abuse more difficult than previous formulations that could be crushed and either snorted or injected. The doctor testified that the mother can perform normal activities while on Suboxone, including parenting tasks. The doctor testified that she currently prescribed for the mother a lower-than-average dosage. The doctor testified that the mother had been compliant with going to counseling, and urine testing in the doctor's office was consistent with her prescription. She said that although she had not yet reduced the mother's dosage, the treatment plan was to do so.

The mother testified that she had become dependent on opiates after being prescribed oxycodone, explaining that she had multiple orthopedic problems. She acknowledged having taken oxycodone even after her prescription ran out. She testified that, at the time her children were taken into DFCS care, she had made plans to enter treatment at Gateway and her father was "on his way" to get her children. She said the younger two children's father was supposed to have been caring for the children while she worked at night. She acknowledged testing positive for cocaine when the children first came into care but said that was "recreational" use and did not reflect "a dependency" on the drug. The mother testified that she had been a patient at Gateway for 60 days at some point after the children were taken into care but

acknowledged that she was discharged without completing the inpatient program. She said she was not allowed to return to Gateway both because she had violated rules there and because she was "clean."

The mother testified that the prior case worker did not contact her regarding drug screening for the first two months. The mother also testified that she had difficulty identifying her current case worker when that case worker was assigned to her case The mother testified that taking diet pills made her test positive for amphetamines and she received conflicting information from testing personnel about whether the pills would cause a positive test. She explained the missing drug screens from the fall of 2014 by saying she had misheard the juvenile court judge say "that was enough of the drug screens" and her case worker had not contacted her for three months.

The mother testified that she began to take Suboxone because she was "down on [her] back" and depressed and considering taking oxycodone, and a boyfriend gave her "a tiny piece" of Suboxone to try. She testified that she was truthful with the doctor but told her that she used to take oxycodone three or four years prior to their initial visit, three to four pills at a time – not that she had last used three to four days

14

prior – and was not using at that time. The mother testified that she had been "clean" since August 2013.

           3.      Visitation and state of mind of the children

The prior case worker testified that the mother maintained regular visitation with the children while they were living in foster care, at least until her visitation was suspended in December 2014. The prior case worker testified that when she initially met the oldest child, the girl was "very happy, very bubbly." Toward the end of the prior case worker's tenure on the case, she said, the girl was "just sad and upset." The girl was "tired" of being in the group home and longed for "her own space, her own room." The current case worker similarly testified to her opinion that a lack of permanency is likely to harm the children. She acknowledged she did not "know how the kids initially came into care to notate that there was a decrease" in their emotional well being but said the children "have indicated that they are concerned because they don't know what their future holds, where they are going to end up."

The State also presented the testimony of a psychologist who had served as the three older children's counselor. The counselor testified as an expert without objection by the mother. He said the older two children in particular "have been going through a lot of emotions related to whether they are going to be going home or if

15

they are going to be placed somewhere or if they are going to be adopted." He testified that the uncertain nature of the children's time in foster care had a negative effect on the children, leaving them "confused" and slow to trust others. The counselor said that the eldest child broke down and became upset for a long time after he discussed the possibility of adoption with the children, indicating she wanted to be reunited with her mother, did not want to be adopted, but also wanted to get out of foster care. The eldest child was aware that her mother had not completed her case plan, he said. Later, he said, the eldest child asked the prospective adoptive mother if she would adopt the children.

C.    Termination order

The juvenile court terminated the parental rights of the mother and the children's fathers in an order filed on June 19, 2015. The court terminated the mother's rights under OCGA § 15-11-310(a)(5), finding that the children were dependent due to a lack of proper parental care and control. In support of that conclusion, the court cited OCGA § 15-11-311(b), finding that the mother had "failed significantly for a period [of] six (6) months prior to the date of the termination hearing: (1) to develop and maintain a parental bond with the children in a meaningful and supportive manner; (2) to provide for the care and support of the

16

children as required by law or judicial decree; and (3) to comply with a court ordered plan designed to reunite the children with the parent."

Citing the mother's failure "to support the children" and "to remain drug free," the court concluded that the children's dependency was likely to continue and likely to cause serious physical, mental, or emotional harm to the children. The court found that the mother had paid a total of $325 in child support during the 35 months her children had been in the state's custody. With respect to drug use, the court cited the mother's missed drug screens, her August 2014 screen that was positive for amphetamines, and the diluted specimen she submitted in 2015, and found that on at least one occasion in July 2014 the mother had refused a drug screen. The court relied most heavily, however, on the mother's use of Suboxone, which it described as "a Level III Controlled Substance" that "may be prescribed as an opiate blocker, but which is also subject to abuse." The court found it significant that people using Suboxone, even with a prescription, are not eligible for participation in the local Drug Court program "due to the effects of the drug and the difficulty in getting off of the drug." The court found that, although the mother obtained a prescription for the drug from a doctor in February 2015, she did not have a prescription when she tested positive for the drug the prior month. The court also noted that, when obtaining the

prescription, the mother said that she used 90 milligrams of oxycodone per day and that her last opiate use was three to four days prior, and the doctor assessed her as "opioid dependent." In sum, the court found that the mother "has been chronically dependent on opiates and even now remains dependent on a Level III Controlled Substance" and that, "[g]iven her inability to become drug free in the past 35 months, there is no reason to believe that she will be able to do so anytime in the near future."

The juvenile court found that "harm will come to the children absent the implementation of the Department's proposed permanency plan of adoption." The court's specific factual findings regarding harm from impermanency were as follows:

> In the absence of this permanency plan, the children will experience doubt, uncertainty and hesitancy in life, which the court finds will be harmful to the children. A foster family placement, despite its good intentions, in many cases does not permit the kind of commitment and continuity that permanency consists of. Foster homes can be more easily disrupted than permanent homes. Children who remain in foster care indefinitely will often develop attachment disorders as they grow older and because of continued instability, may resort to delinquent or other anti-social behaviors. Prolonged foster care, known as "foster care drift", would therefore be harmful to the children. For these reasons, the children will experience harm if the permanency plan of adoption is not effectuated.

The mother filed a motion for new trial, which was denied by the trial court after a hearing. In its order denying the motion, the trial court found that "[w]hile the mother's expressed desire to seek treatment is certainly laudable, it is outweighed by her significant drug history." The court also amplified its findings that the children's continued dependency was likely to cause them harm:

> Expert testimony demonstrates that the children are confused, fearful and distrustful of others. The children are aware of, and disappointed in, the parents' failures to complete reunification goals and desire to be out of foster care. Without providing the children with the permanency of an adoptive home, these feelings are likely to continue. The Department's adoptive plan is for the children to be adopted by a family that they are familiar with through their current group home placement. At the time of the termination of parental rights hearing, the children had not been told that the family was interested in adopting the sibling group. The children are close to this family and, in fact, [the eldest child] asked the potential adoptive mother if she would adopt them. Based on all of the testimony, the court finds that the continued dependency, and the lack of a permanent adoptive home, will likely cause the children mental and emotional harm in the future.

We granted the mother's application for a discretionary appeal.

II.    Analysis

On appeal, the mother challenges the trial court's findings that (1) chronic, unrehabilitated substance abuse rendered her incapable of providing adequately for her children's needs; (2) the cause of her children's dependency is likely to continue; and (3) the continued dependency would cause serious physical, mental, emotional or moral harm to the children. Assuming without deciding that the children are dependent and the cause of that dependency is likely to continue, we hold that the trial court's factual findings are insufficient to support its conclusion that continued dependency experienced by the children will cause or is likely to cause them serious physical, mental, emotional, or moral harm.

OCGA § 15-11-310(a)[8] provides that a court considering termination of parental rights must first determine whether at least one of five statutory grounds for termination has been met. Here, the trial court terminated the mother's rights under OCGA § 15-11-310(a)(5), which provides that a ground for termination exists when:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the

---

[8] We apply the new Juvenile Code to these proceedings even though the State filed the initial deprivation petition in July 2012, because the State's termination petition was filed in March 2015, after the new Code went into effect on January 1, 2014. *See In the Interest of J. A. B.*, 336 Ga. App. 367, 367 (785 SE2d 43) (2016); Ga. L. 2013, p. 294, § 5-1.

circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

If it finds that any of the five statutory grounds has been proven, the juvenile court then shall consider whether termination is in the child's best interest. OCGA § 15-11-310(b). Grounds for termination must be proven by clear and convincing evidence. OCGA § 15-11-320(a). A trial court's order terminating parental rights must "[c]ontain written findings on which the order is based, including the factual basis for a determination that grounds for termination of parental rights exist and that termination is in the best interests of the child[.]" OCGA § 15-11-320(b)(1).

A.     Dependency and likelihood dependency will continue

The mother argues that the trial court erred by finding that there was clear and convincing evidence of chronic, unrehabilitated substance abuse such that the children were dependent and that dependency was likely to continue. Among the grounds on which a juvenile court may find a child dependent due to lack of proper parental care and control is a parent's "history of chronic unrehabilitated substance abuse with the effect of rendering a parent of such child incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his

21

or her child." OCGA § 15-11-311(a)(2). This case raises close questions of whether there is clear and convincing evidence that the children are dependent and whether that dependency is likely to continue.[9] Because we conclude that the record does not

_____

[9] The mother in particular faults the trial court's reliance on her use of Suboxone in support of its conclusions about dependency. Indeed, once she obtained a prescription for the drug, there is no evidence in the record that the mother abused Suboxone or that it rendered her incapable of providing for the needs of her children. *See In the Interest of M. L. C.*, 249 Ga. App. 435, 439 (2) (548 SE2d 137) (2001) (rejecting finding of deprivation to the extent it was based on father's use of "large quantities of prescribed pain medication" without evidence of abuse). Other than evidence that the mother acquired some Suboxone from a friend, resulting in one positive drug screen before she obtained a prescription, the evidence is that the mother was taking the drug as prescribed by her doctor and that it would not interfere with her performance of parenting tasks. The doctor testified that the drug creates little to no high and is difficult to abuse given its formulation. The doctor, qualified as an expert without objection, also testified that the mother's Suboxone usage would not interfere with her performance of parenting tasks. When it terminated the mother's rights, however, the trial court found that Suboxone is subject to abuse and cited the Drug Court's refusal to admit Suboxone patients "due to the effects of the drug and the difficulty in getting off of the drug." In concluding that the mother was drug dependent and unlikely to "become drug free" in the near future, the trial court appears to have relied on incompetent, non-expert testimony from a DFCS case worker and a Drug Court Treatment Center testing coordinator about the effects of Suboxone. But the mother's use of Suboxone was not the sole factor on which the trial court relied in finding the children were dependent and the cause of their dependency was likely to continue, and we do not reach the question of whether the trial court's findings support its conclusions on those points. Should the State once again seek termination, we remind the trial court to consider only competent testimony, in particular about Suboxone.

22

support a finding that any continued dependency was causing or is likely to cause the children serious harm, we need not resolve those questions.

B.      Likelihood that dependency will cause the children serious harm

OCGA § 15-11-310(a)(5) demands that the juvenile court terminate parental rights based on dependency only upon finding by clear and convincing evidence that "the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm" to the child in question. We have long said that a finding that dependency is likely to continue does not *necessarily* justify a finding that a child's continued dependency will harm the child, although such a finding of dependency could support a finding of harm in particular circumstances. *See In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011) (whole court) (analyzing under "deprivation" standard of former Juvenile Code). The trial court certainly appeared to recognize this, making factual findings clearly aimed at resolving the question of harm. But in ruling on the mother's motion for new trial, the trial court observed some divergence in our case law as to the question of harm, saying that some of our decisions have framed the question as one of whether the child would be harmed if returned to the parent, while others have focused on whether the child would be harmed by the status quo were the parent's rights not

23

terminated. Noting we had observed as much in *In the Interest of M. S. S.*, 308 Ga. App. 614, 620 (2) (b) (708 SE2d 570) (2011) (physical precedent only), the trial court proceeded to find that the children would be harmed under either scenario.

While we do not quarrel with the trial court's assessment of our case law on this point as less than clear, we note that, subsequent to *M. S. S.*, this Court in a whole court decision added some measure of clarity. *See J. E.*, 309 Ga. App. at 58 (1) (d). In *J. E.*, we disapproved prior case law to the extent that it could be read to forbid any inquiry into the child's present relationship with the parent. *Id.* (*disapproving In the Interest of J. K.*, 278 Ga. App. 564 (629 SE2d 529) (2006)). And we held that our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent. *See id*. Stated differently, "[w]hen a court assesses whether a child now in foster care is likely to suffer serious harm as a result of continued deprivation, . . . the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists." *In the Interest of C. L.*, 315 Ga. App. 607, 611-12 (1) (b) (727 SE2d 163) (2012).

This dual consideration makes sense given that the statute requires the State to show that continued dependency – not merely a specific arrangement for the child – will cause harm. Dependency will cause harm only if all of the options available to DFCS short of termination – keeping the child in foster care, or returning the child to the parent – will themselves cause harm. Thus, it follows logically that the potential harm of both options should be considered.

We have not articulated, however, how the answer to each of these two questions affects the ultimate conclusion as to whether the evidence supports a finding that continued dependency will cause or is likely to cause serious harm to the child. Given the reason that we must consider both questions (that they are the range of options available to DFCS in the absence of termination), it is clear that the State must show that both would cause harm. This is consistent with our approach in leading decisions articulating this dual consideration. *See C. L.*, 315 Ga. App. at 612-13 (1) (b) (finding evidence of a likelihood of harm under either potential disposition short of termination); *J. E.*, 309 Ga. App. at 58 (1) (d) (concluding that the juvenile court was entitled to determine that "no benefits to be obtained from a continuance of the parent-child relationship, however desirable in themselves, were sufficient to protect [the child] adequately from the harmful consequences of the mother's" likely

25

continued failings). Under this framework, whether returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo. And, indeed, the trial court here made no specific findings on the former question, merely stating in general terms "that the evidence supports a finding of harm if the children were to be returned to a parent."

Our understanding is consistent with those decisions in which we have reversed termination orders due to a lack of evidence that the children would experience serious harm if they remained in foster care, even when the State did show that the return of the child to the parent might well cause harm. *See, e.g., In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (reversing and noting that "the mother's inability to care for her children does not necessarily mean that her current relationship with them is detrimental") (citations and punctuation omitted); *In the Interest of A. T.*, 271 Ga. App. 470, 473 (620 SE2d 121) (2005) (same); *In the Interest of D. F.*, 251 Ga. App. 859, 861-62 (2001) (reversing termination where mother could not care for children, because State did not meet evidentiary burden to show harm from continuing foster care status quo). And this approach is also consistent with cases in which we have held that the State has proven continued dependency will cause or is likely to cause serious harm to the child because the

26

evidence shows the child will be harmed if returned to the parent; in many of those cases, the evidence also would support a finding that the parent's relationship with the child, or lack thereof, is such that maintaining the status quo of foster care with a continued parental realtionship would also be harmful. *See*, *e.g., In the Interest of O. B.*, 337 Ga. App. 401, 403-04 (1) (787 SE2d 344) (2016) (evidence showed that mother reported that she was "homicidal" and heard voices in her head when she did not take her medicine, which she failed to take); *In the Interest of M. J. T.*, 255 Ga. App. 553, 555-56 (565 SE2d 877) (2002) (evidence showed father had been convicted of rape and sodomy, had a mental illness, and refused to take his medications).

In considering whether there is evidence that remaining in foster care will cause serious harm to a child, we have examined both (1) the extent to which instability and impermanency are "currently causing specific harms" to the child and (2) whether the parent's current relationship with the child is itself detrimental. *See In the Interest of S. O. C.*, 332 Ga. App. 738, 746 (3) (774 SE2d 785) (2015). We consider this question with the knowledge that:

> Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is

governmental extinguishment of the parent and child's constitutional right to familial relations. There is, then, no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. . . . [T]his Court has repeatedly recognized that the constitutional right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

*Id.* at 743 (punctuation and footnotes omitted). In the light of these considerations, we conclude that the evidence here does not support the trial court's conclusion that the children will be harmed seriously were they to remain in foster care, by virtue of either their relationship with their mother or the impermanency of that situation. Therefore, whatever possibility of harm might exist were the children to be returned to the mother bears little significance.

There is no evidence in this record that maintaining the mother's relationship with the children while they remain in the protection of foster care will itself cause them harm. "[A] mother's inability to care for her children does not necessarily mean that her current relationship with them is detrimental." *A. T.*, 271 Ga. App. at 473. The mother undisputedly had positive visits with the children, including a visit in her

home.[10] The children were happy to see their mother when they had the opportunity.[11] There was no evidence that the mother arrived impaired at any of her visits. The worst that was said of her handling of these visits was that she expressed hope to the children that they would be able to return home soon and told them it was up to the case worker to approve that.[12] . Additionally, although she inquired about the prospect of adoption by a particular family, the eldest child also expressed dismay at the prospect of adoption generally. We have reversed orders terminating parental rights when there is no evidence that the child's relationship with the parent was itself harmful, even when the parent was in prison. *See, e.g., In the Interest of C. K. S.*, 329

---

[10] In an August 2014 report, the CASA told the court that he had observed four visits by the mother and the younger children's father at the children's group home, the latest in May 2014, and "[a]ll the visits were very positive and all parties displayed a loving family relationship."

[11] A DFCS case worker who saw the mother interact with the two oldest children at a citizen panel review in December 2013 said the children "were all over her, very happy to see her."

[12] The DFCS case worker who testified to this criticized the mother's approach as getting the children's hopes up, saying she asked the mother to change the subject when the children asked about going home. The case worker acknowledged that she did not have personal knowledge of what went on between the mother and the children in their visits at the group home where they were staying, but was testifying about this interaction based on what the children reported back to her. And, in any event, parental optimism cannot possibly be a basis for termination.

Ga. App. 226, 230-31 (1) (b) (i) (764 SE2d 559) (2014) (physical precedent only) (insufficient evidence of harm if rights of father, incarcerated on accountability-court contempt sanctions of 48 days at the time of the termination hearing, were terminated); *In the Interest of K. J.*, 226 Ga. App. 303, 308 (2) (b) (486 SE2d 899) (1997) (reversing termination where none of the witnesses testified that the child's relationship with the father was harmful and evidence showed that the father and child had a positive relationship, to the extent permitted by the father's incarceration).

The trial court made no specific findings to the contrary.[13] Rather, it relied on generalized findings that the children would experience harm absent the stability and permanency of an adoptive home. It is true that we have observed that "children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems." *J. E.*, 309 Ga. App. at 58 (1) (d) (citation omitted). And, as the State points out, one of the codified purposes of the termination procedures set forth

---

[13] In its conclusions of law, the trial court recited the OCGA § 15-11-311(b) factors, including that the mother had "failed significantly for a period of six (6) months or longer prior to the termination hearing . . . to develop and maintain a parental bond with the children in a meaningful and supportive manner[.]" But the court made no particular factual findings regarding the mother's bond with the children or lack thereof, noting that the mother had maintained regular visitation with the children until December 2014, when visits were suspended pending three consecutive clean drug screens.

in the Juvenile Code is "[t]o eliminate the need for a child who has been adjudicated as a dependent child to wait unreasonable periods of time for his or her parent to correct the conditions which prevent his or her return to the family[.]" OCGA § 15-11-260(a)(2). But the Code also provides that the State must provide the grounds for termination by "clear and convincing evidence" and the trial court must make written findings as the factual basis for termination. OCGA § 15-11-320(a), (b)(1). To permit termination under OCGA § 15-11-310(a)(5), the Code requires evidence of a likelihood of "serious" harm. And behind all of this lies the inexorable command of the United States Constitution, which safeguards a parent and child's right to familial relations. *See S. O. C.*, 332 Ga. App. at 743.[14]

In keeping with these requirements of specific findings by clear and convincing evidence of serious harm, we have reversed termination orders unsupported by evidence of particularized findings of harm experienced by the children while in foster care. *See, e.g., In the Interest of M. M. R.*, 336 Ga. App. 14, 24 (1) (d) (783

---

[14] Our statement in *C. L.* expressing doubt "that affirmative and individualized evidence always is required to authorize a finding that a child has a need for permanence and stability" most certainly is dicta, as we went on to find that the record did indeed contain such evidence. 315 Ga. App. at 613 (1) (b). We have power to decide only the case that is before us, and pronouncements that purport to say what can constitute serious harm in a case not before us are binding on no one.

SE2d 415) (2016) (physical precedent only) (reversing termination order in part because record was devoid of evidence that termination of grandmother's parental rights would result in serious harm to child; juvenile court order cited "general propositions regarding stability through adoption"); *A. T.*, 271 Ga. App. at 473-75 (reversing termination of rights given no particularized evidence as to adverse effects of foster care or impermanency on the children in question). And "[w]here the evidence shows that . . . the mother and children are bonded and emotionally close (as here), the lack of specific evidence regarding potential harm mandates reversal even more strongly." *Id.* at 474.

The only non-generalized findings by the trial court on this point were (1) that the children were "confused, fearful and distrustful of others," and (2) the children were "aware of, and disappointed in, the parents' failures to complete reunification goals and desire to be out of foster care." This is not enough.

And a review of the record does not reveal support for more findings on remand. The children's counselor testified that at least the older two children had "been going through a lot of emotions" related to the uncertainty of their situation and were "confused" and slow to trust. The former DFCS case worker assigned to the case testified that the oldest child had gone from "very bubbly" on their initial meeting"

32

to "sad and upset" toward the close of the case worker's tenure on the case, noting the child wanted her own room. The current case worker said the children were concerned about their uncertain future, but she acknowledged she had no knowledge about their emotional state when they came into foster care. Without minimizing the stresses experienced by these children, we find this testimony is not the sort of evidence of serious harm necessary to justify permanent severance of the parent-child relationship. We do not doubt that many children, especially older children, suffer emotional stress and sadness from the uncertainty inherent in foster care. But this is not enough "to show that continuing the legal relationship of parent and child is inherently harmful to the children." *In the Interest of S. B.*, 335 Ga. App. 1, 9 (1) (780 SE2d 520) (2015) (testimony that children had experienced some developmental delays and showed some symptoms of reactive attachment disorder not clear and convincing evidence that continued deprivation will seriously harm the children, given that the children were not diagnosed with the disorder and were not receiving any counseling other than speech therapy). *Compare In the Interest of T. A.*, 331 Ga. App. 92, 96-97 (2) (d) (769 SE2d 797) (2015) (harm shown where record included not only expert testimony about potential problems from lack of stability in foster care, but also evidence that child regressed after visits with mother by acting out, not

following direction, and soiling himself, and became distraught when mother, who had an intellectual disability, did not show up for scheduled visits). Here, there was no evidence presented at the hearing that in their current circumstances the children were performing poorly in school or displaying significant age-inappropriate behavioral problems.[15] And, although the trial court found that the children's fear, confusion and disappointment would be likely to continue if they were not adopted, and cited the eldest child's inquiry with a prospective adoptive parent, "the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family." *S. O. C.*, 332 Ga. App. at 746 (3) (footnote and punctuation omitted). "[T]he State has no business facilitating the adoption of children entrusted to its care until and unless a parent has, by her actions or inaction, forfeited her constitutional right to familial relations." *Id.*

---

[15] The mother testified that one of the children, four years old at the time of the hearing, was "having a lot of behavioral issues because she wants to come home to me." The children's counselor said his therapeutic work with that child was "basically behavior modification," saying she "can be a little firecracker at times." But there is no evidence that the child was having any behavioral issues that were unusual for her age. And, unlike in *T. A.*, there is no evidence that the child's issues directly stemmed from her interactions with her mother or her mother's failure to visit. Indeed, a report submitted by the CASA a few days before the termination hearing stated that all four of the children "display good social skills." The report stated that the two oldest children were continuing to excel in school, with both making the honor roll.

at 747 (3) n.29 (citation and punctuation omitted). The trial court's factual findings are insufficient to support its conclusion that any continued dependency experienced by these children will cause or is likely to cause them serious physical, mental, emotional, or moral harm, and we therefore reverse.

*Judgment reversed. Phipps, P. J., and Dillard, J., concur*.