**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 8, 2018**

# In the Court of Appeals of Georgia

A17A1799. IN THE INTEREST OF B.R.J., et al., children.

MERCIER, Judge.

The mother of four children, B. R. J., J. L. J., A. S. M. J. and T. D. J., filed an application for discretionary appeal from the order of the Juvenile Court of Effingham County terminating her parental rights to the children, contending that the Department of Family and Children Services (DFCS) failed to prove by clear and convincing evidence that her parental rights should be terminated.[1] We granted the mother's

---

[1] On the date the termination order was entered (July 8, 2016), B. R. J. was eight years old, J. L. J. was six years old, A. S. M. J. was three years old, and T. D. J. was two years old. A fifth child, L. J., who was nine years old when the order was entered, was not named in the termination petition or termination order. Although it is not clear from the record why he was not included, it appears that L. J. has a different father from the other four children and that DFCS was evaluating L. J.'s situation separately.

application. After a thorough review, we find that the evidence was insufficient to support a termination of the mother's parental rights. Accordingly, we reverse.

On appeal from a juvenile court's decision to terminate parental rights, this Court reviews the evidence in the light most favorable to the court's ruling and determines whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should be terminated. *In the Interest of C. S.*, 319 Ga. App. 138, 139 (735 SE2d 140) (2015). Further, "[i]n the appellate review of a bench trial, . . . due deference must be given to the trial court, [inasmuch as] it has the opportunity to judge the credibility of the witnesses." *Strickland v. Strickland*, 298 Ga. 630, 633-634 (1) (783 SE2d 606) (2016) (citations omitted). Nonetheless,

> this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.

*In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (805 SE2d 285) (2017) (footnote omitted).

So viewed, the evidence shows the following. The children came to the attention of DFCS in March 2014 because B. R. J. had "some skin issues," and there were "numerous people living in and out of the home." DFCS initiated a "family preservation case" to provide "services in the home due to the children's special needs, some delays noticed of the children, and [to] address[] [the mother's] mental health issues."[2] In November 2014, the mother tested positive for methamphetamine and barbiturates, and DFCS took custody of the children.

On November 21, 2014, the juvenile court entered a preliminary protective order stating that DFCS filed a complaint alleging that the children were dependent and that the court held a hearing on November 17, 2014. In its preliminary order, the court determined that there was probable cause to believe that the children were dependent as defined in OCGA § 15-11-2 (22), and including the following: there were "allegations of neglect of the children and the children's hygiene"; a safety plan had been developed with the mother and the children's legal father (J. G.) in August 2014 which stated that the mother would not be left unsupervised with the children "due to

---

[2] The mother requested in her notice of appeal that no portion of the record be omitted from the record on appeal and that the entire transcript of evidence and proceedings be transmitted to this Court. Nonetheless, the March 2014 case plan is not in the record.

3

her unaddressed mental health issues"[3]; the mother was non-compliant with service providers and missed appointments for a psychiatric evaluation and had not cooperated in scheduling a mental health assessment; the children's school reported numerous absences and chronic hygiene issues; T. D. J. was not current on immunizations and had not been to a doctor since his birth; 19 people were living in the three-bedroom, one-bathroom house; the mother tested positive for barbiturates and methamphetamine, admitted that she smoked marijuana and had shown marijuana to the children; the children's father had not helped the mother get necessary mental health assessments; service providers reported a chaotic household and an inability to provide services; and the mother's family members resided with her and had a history with DFCS regarding inadequate supervision and neglect. The court found that removing the children from the home pending the filing of and a hearing on the dependency petition was necessary for their protection and that temporary continuation in foster care was in their best interest. The court stated that "the mother is unable to provide for the basic needs of the children and had unaddressed mental health needs and substance abuse issues. The father is unable and unwilling to help his

---

[3] The August 2014 safety plan is not in the record.

wife get the assistance she needs or in the alternative find a separate living arrangement for himself and the children."

In December 2014, the court held an adjudicatory hearing on DFCS's dependency petition.[4] In its order of adjudication and temporary disposition entered January 9, 2015, the juvenile court set out essentially the same findings made in its November 2014 order. In addition to the findings stated above, the court added that A. S. M. J.'s immunizations were not current; that the mother's girlfriend (who also lived in the house) tested positive for marijuana; and that the children's father was "a registered sex offender through charges brought in Delaware." The court found that the children were dependent as "a result of substance abuse by the children's parent, . . . [and that] [t]he substances abused are barbiturates, methamphetamine, and marijuana," and that the parents had not been cooperative with DFCS's efforts to provide resources and services.

On January 16, 2015, after a disposition hearing, the court entered an order continuing temporary legal custody with DFCS. The court noted that DFCS submitted

---

[4] The dependency petition is not in the record.

a case plan for reunification and that it was a suitable plan, and ordered DFCS to implement the plan.

In April 2016, DFCS filed a petition to terminate the mother's parental rights to the four children, citing the mother's failure to make progress on her case plan for reunification. The petition included the following allegations: the mother was discharged from parenting classes because her attendance was inconsistent and she was "non-complian[t]"; her only income was Social Security disability benefits and she failed to provide DFCS with a budget to show that she could support herself and her children on her income; "random other people" were living in or visiting the home; her attendance in a substance abuse treatment program was sporadic and her participation was sometimes inappropriate; she admitted that she smoked marijuana and that she did so in the children's presence; she had positive drug screens during the case plan; she had slurred speech and difficulty standing during one visit with the children, and tested positive for phenobarbital at that visit; she was diagnosed with generalized anxiety disorder and mood disorder; her mental health needs were not being met; she was discharged from counseling and anger management class for inconsistent attendance and inappropriate engagement when she attended; she had difficulty controlling the

children during visits; and she did not provide financial support for the children while they were in DFCS's custody.

A hearing on the termination petition was held on June 20, 2016. The caseworker testified that in November 2014, when DFCS initially took custody of the children: 19 people were residing in the home, including the mother, her mother, her sister, her sister's family, and the legal father of the four children; the mother had tested positive for methamphetamine and barbiturates; the children had "special needs";[5] and the mother had "mental health issues."

The caseworker then testified as to the components of the reunification case plan that was established for the family. The written case plan was not included in the exhibits DFCS introduced at the hearing and it is not in the appellate record. Nonetheless, according to the caseworker, the plan required the mother to: schedule a psychiatric evaluation and follow the treatment recommendations of the healthcare provider; attend and complete counseling sessions; participate in anger management therapy "to promote . . . strategies, . . . techniques, and . . . skills to use in place of

---

[5] The caseworker testified that B. R. J. was "behind academically"; J. L. J. had "ADHA, . . . reactive attachment, and . . . some development delays"; A. S. M. J. had "developmental delays"; and T. D. J. had asthma.

7

the verbal and physical aggression that we were seeing"; participate in parenting education that focuses on substance abuse; attend and complete a substance abuse program; remain drug- and alcohol-free for six consecutive months and test negative when screened; obtain a source of income for six consecutive months in order to meet the financial needs of herself and her family; obtain and maintain stable clean and safe housing that was large enough for her and the children for six consecutive months; create a childcare plan to ensure proper supervision of the children; and cooperate with family service providers.

When asked if the mother completed any of the plan requirements, the caseworker replied that the mother completed an anger management workshop; that the mother and her mother were living together in a different house from the removal house, but the caseworker had seen "a couple of other people there" during her visits and was concerned that "in six weeks I'll show up unannounced and there's already other adults in and out of that home"; the mother had not presented DFCS with a budget; the mother had not paid child support while the children were in foster care (though she was on SSI and had not been ordered to pay child support); the mother tested positive for phenobarbital in February 2016 during a visit in which she was "very disengaged, sleepy, very lethargic," though the mother explained that she had

8

taken only her prescribed medication and DFCS obtained information "a couple of months" later verifying the prescription; the mother was evicted in January 2016 from her previous rental house; and the mother had gotten into a physical altercation with two teenagers.

During cross-examination, the caseworker acknowledged that the mother received a certificate of completion for a substance abuse treatment program; that she had not tested positive for any illegal substances since November 2015; and that the mother's new home had sufficient space. The caseworker testified that two parenting education providers had discharged the mother from their programs, one for "non-compliance," that some parenting education providers "would not take [the mother's] case," and that the mother would have "to seek out services on her own." The caseworker agreed that during a prior judicial case review the court had directed DFCS to provide the mother with additional parenting classes, but stated that the company to which DFCS had referred the mother after that review did not accept the mother's case. When she was asked what "neglect issue" remained, the caseworker replied "[t]he untreated mental health issues." She stated that the mother's mental health status "would interfere, and . . . did interfere, with getting the children to school on time,

9

making sure they went to school, and that's some of the academic delays that are with the older children."

The mother testified that she was "see[ing] the doctor at Gateway [Behavioral Health]," and was "also see[ing] a counselor at Gateway." She testified that she underwent an assessment and mental health treatment at Gateway (pursuant to a referral by her caseworker), that she went for several months, and that she stopped going in March 2016 because the providers told her she did not need to return; she stated that her caseworker did not tell her that she needed to resume counseling. The mother testified that she also went to another facility, Coastal Harbor, for counseling in 2016, where she was evaluated and told that she needed to continue taking her medication but did not need counseling.

When asked why she was receiving Social Security (or SSI) disability payments, the mother testified that she has scoliosis, seizures, and kidney problems; the mother added that she was prescribed phenobarbital and other medications, including a prescription for depression, that she takes her medications as prescribed, and that the anti-seizure medication prescribed to her makes her sleepy. She stated that she was sleepy at the February 2016 visitation because she had a seizure the night before and had gone to the hospital, that at the hospital she was given anti-seizure medication, that

she was told not to skip doses of her medications, and that she then took a prescribed dose of the medication before going to the DFCS office. Because the medication makes her drowsy, the mother stopped taking it during the day and takes it only at night. When asked if she has a bi-polar disorder, the mother replied that she had said that she did, but that a doctor told her she did not. Regarding the physical altercation with two teenagers, the mother testified that they had injured one of her family members, and that she believed that the fight occurred before she took the anger management class.

The mother testified that only she and her own mother lived in the then-current house, that other people did visit her, that the children's legal father was in jail and no longer lived with her, that she was divorcing him, and that she was no longer in a relationship with the boyfriend she had been seeing. She testified that she receives disability payments of $733 per month and food stamps; that she and her mother share the rent payment; and that her own portion of the rent is $300 per month. The mother stated that she was evicted from her previous residence not because she was unable to pay the rent, but because the home was not safe; she decided to stopped paying rent and moved out. She testified that she went to the child support office to start making child support payments when the children were in foster care, but the child

support recovery workers told her they could not take support payments from her SSI disability benefit payments. She testified that she did give the children gifts, money and other items.

The mother testified that she tried to complete parenting classes, but that it was not clear from the case plan or the caseworker which parenting classes were required or would be acceptable, and she was having difficulty finding any approved providers willing to give her the training or to continue the training. Other than the parenting classes, the mother believed that she had completed all of the case plan requirements. (Notably, judicial review orders introduced at the termination hearing include findings that the mother attended a parenting class in January 2015 but was discharged in March 2015 for failure to attend scheduled sessions.)

The children's maternal grandmother testified that she and the mother were living in the newest residence; that she (the maternal grandmother) received disability benefits of $1221 per month; that she was able to pay the bills herself but that the children's mother helped; that other family members and friends visited the house often but did not live there; that she and the children's mother contacted several providers and tried to make arrangements so that the mother could complete the case plan requirements, even though the grandmother was willing to pay for the services

herself, but the providers that were DFCS-approved would not come to the house and the providers with whom the grandmother did make arrangements were not "State Certified by DFCS."

The children's guardian ad litem testified that she observed a visit in the DFCS office in January 2015 during which the mother encouraged the children to run through the office area in which the visit was taking place, though it was not designed to be a play area. The guardian ad litem testified that when she met with the mother at the new residence, the mother became excited or angry when they discussed "the whole topic of losing her children permanently" or when they discussed the parenting classes that she had to take but "that she couldn't take"; the maternal grandmother was trying to calm the mother down, and the guardian ad litem "kept trying to make sure that [the mother] didn't get up out of her chair." She added that the new home was "very nice," but that the family had only been there two to three months at the time of the hearing. The guardian ad litem most concerned with "the anger management," in that the children were "rambunctious" and if placed together in a home "with somebody with anger management issues . . . [it caused her to] worry." The guardian ad litem recommended terminating the mother's parental rights.

At the close of evidence, counsel for the mother argued that the mother had substantially completed her case plan, pointing to evidence that she had undergone "mental counseling," had "clean drug screens," obtained suitable housing, and had taken some parenting classes though she had not completed them. Counsel for DFCS replied that the mother "still had quite a few components left in her case plan."

The court then asked DFCS's counsel to tell the court "from the department's standpoint, what exactly is outstanding?" DFCS's counsel replied:

> The mental health counseling services and completing that and getting that on track. I don't know that there's ever been a formal diagnosis. There's been stuff thrown around with bipolar, and depression, and anxiety, and mood disorder, and schizophrenia, but we've never gotten anything nailed down, because as [the caseworker] said, she has not followed through with any of these referrals that we have made, or maybe does one appointment and then never follows up. So we have not been able to actually determine what mental health issues may exist out there.[6]

DFCS's counsel added that the mother "has not done the parenting classes." "[T]hose are the two main components," noting "[w]e didn't know that the substance abuse –." (The implication was that substance abuse was no longer alleged, presumably because the mother's drug

---

[6] DFCS's assertion that there had been no formal diagnosis conflicts with its allegation in its Petition to Terminate Parental Rights, that "Gateway diagnosed [the mother] with Generalized Anxiety Disorder and Mood Disorder." Gateway was an agency to which DFCS referred the mother for mental health and substance abuse services.

14

screens had been negative for six months.) DFCS's counsel added that the mother "needed some addition[al] anger management," asserting: "[w]e would like to see her go through a more therapeutic program" than the one she completed. On July 8, 2016, the court entered an order terminating the mother's parental rights.

In its order, the court included the following findings: the mother failed to show that she could support the children with her income; she moved several times while the children were in foster care; she was evicted earlier that year; the mother's newest residence was crowded; she continued to use illegal drugs throughout the plan; she interacted inappropriately with the children during visitation; she was diagnosed with generalized anxiety disorder and mood disorder; she failed to attend counseling sessions; she had a physical altercation with two juveniles; she displayed anger in the guardian ad litem's presence; she failed to complete a substance abuse treatment program; she smoked cigarettes in the home even though one of the children had asthma; and she failed to provide financial support for the children while they were in the custody of DFCS. The court acknowledged that the mother consistently visited the children, and that she had been prescribed phenobarbital (for which she tested positive at the February 2016 visit).

Referencing the statutory grounds for termination set out in OCGA § 15-11-310 (a) (5), the court found that the children were dependent due to a lack of proper parental care or control, that DFCS had made diligent and exhaustive efforts in attempts to reunify the family and that, due to the mother's ongoing inability and/or refusal to complete the case plan, the dependency was likely to continue and was likely to cause serious physical, mental, emotional or moral harm to the children. The court concluded that the grounds for termination had been met.

OCGA § 15-11-310 sets forth the grounds for terminating parental rights. It pertinently provides:

> (a) In considering the termination of parental rights, the court shall first determine whether one of the following statutory grounds for termination of parental rights has been met: . . .
>
> (5) A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

Under OCGA § 15-11-2 (22) (A), a "'[d]ependent child' means a child who . . . [h]as been abused or neglected and is in need of the protection of the cour[t]." "'Neglect' means . . . [t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or moral[s]." OCGA § 15-11-2 (48) (A).

OCGA § 15-11-310 (b) pertinently provides that if any of the statutory grounds for termination has been met, the court shall then consider whether termination is in a child's best interests after considering certain factors. "[T]he standard of proof to be adduced to terminate parental rights shall be by clear and convincing evidence." OCGA § 15-11-303.

1. The mother contends that the juvenile court erred by terminating her parental rights because DFCS failed to present clear and convincing evidence that the children were "presently dependent" and "continue to be dependent" due to lack of proper parental care and control . See generally OCGA § 15-11-310 (a) (5), supra. She asserts that DFCS failed to prove that she did not substantially complete the requirements of her case plan for reunification, noting that the case plan was not offered in evidence and there was no evidence that the mother was given a clear description of what was required of her from the beginning of the case.

17

(i) *Are the children dependent?* "DFCS was required to present at the termination hearing evidence of present deprivation, not past or potential future deprivation." *In the Interest of M. T. F.*, 318 Ga. App. 135, 145 (1) (733 SE2d 432) (2012) (emphasis and footnote omitted).

> Where, as here, the child[ren] ha[ve] been removed from parental custody, DFCS may prove current deprivation by showing that, if the child[ren] w[ere] returned to [their] mother at the time of the hearing, [they] would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing.

Id. at 145-146 (1) (footnote omitted). See *In the Interest of S. P.*, supra (noting that the definition of a "dependent child" under the new Juvenile Code is similar to the definition of a "deprived child" under our former Juvenile Code). "[C]lear and convincing evidence of *present or current* parental unfitness, as opposed to past unfitness, is required to terminate a mother's rights to her natural child." *In the Interest of T. M.*, 329 Ga. App. 719, 720 (766 SE2d 101) (2014) (citation and punctuation omitted); *In the Interest of D. D. B.*, 282 Ga. App. 416, 418 (1) (638 SE2d 843) (2006) (evidence of past unfitness, standing alone, is insufficient to terminate the rights

18

of a parent in her natural child); *In the Interest of M. L.*, 290 Ga. App. 437, 441 (3) (659 SE2d 800) (2008).

Here, as set out above,"[t]he mother's circumstances at the time of the termination hearing were significantly different from the circumstances which caused [the children] to be placed in the custody of DFCS." *In the Interest of M. T. F.*, supra at 146 (1). There was evidence that the mother had made significant improvements in her housing, substance abuse and mental health circumstances. However, the mother did not previously challenge the court's earlier ruling that the children were dependent on those grounds, and the court was authorized to find from the evidence presented that the children remained, to some extent, dependent. See generally *In the Interest of A. S.*, 339 Ga. App. 875, 879 (1) (794 SE2d 672) (2016).

(ii) *Have reasonable efforts to remedy the circumstances been unsuccessful?* At the termination hearing, when the court asked DFCS's counsel which case plan requirements had not been satisfied, counsel replied that there were two – mental health diagnosis and counseling, and parenting classes; she then added that she wanted to see the mother complete "a more therapeutic anger management program" than the one she completed.

Importantly, the reunification case plan was not admitted in evidence at the termination hearing and is not in the appellate record. And the testimony does not set out in detail what was required of the mother regarding mental health treatment, counseling, or anger management. In any event, to the extent the case plan requirements are discernable from the record, clear and convincing evidence does not show that reasonable efforts to remedy the circumstances that caused the children to be placed in DFCS's custody have been unsuccessful.

In fact, at the time of the termination hearing, the mother had adequate housing, stable income, and clean drug screens, and she had completed a substance abuse treatment program; she had also undergone a mental health assessment, started counseling and treatment, and had completed an anger management program. No mental health professional testified at the hearing, and it is not clear from the record what mental health treatment the mother needed in order to remedy the circumstances. And while the mother had not yet completed parenting education, her attempts to arrange for acceptable parenting classes continued through the period just before the termination hearing.

Thus, in this case, even construing the evidence in the light most favorable to the termination order, the record does not show by clear and convincing evidence that

reasonable efforts to remedy the circumstances of dependency were unsuccessful. See generally *In the Interest of T. M.*, 329 Ga. App. 719, 724 (1) (a) (766 SE2d 101) (2014).

(iii) *Is the cause of the dependency likely to continue or not likely to be remedied?* Similarly, the record does not show by clear and convincing evidence that the cause of dependency will continue or will not likely be remedied. At the time of the termination hearing, the mother had made significant progress toward eliminating the causes of the dependency. Given the progress the mother made and was still attempting to make toward reunification, testimony that the DFCS caseworker felt that further mental health assessments, counseling and classes other than those completed by the mother were still needed does not establish by clear and convincing evidence that the cause of dependency would continue or would not likely be remedied.

In our view, the evidence is not clear and convincing, at least at this time, that the cause of the dependency is likely to continue. See *In the Interest of N. T.*, 334 Ga. App. 732, 743 (3) (780 SE2d 416) (2015).

(iv) *Is the continued dependency likely to cause serious physical, mental, emotional, or moral harm to the children*? The mother contends that DFCS failed to

present clear and convincing evidence that continued dependency is likely to cause serious harm to the children unless the mother's parental rights are terminated.

> [W]hen a court assesses whether a child now in foster care is likely to suffer serious harm as a result of continued deprivation, . . . the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists.

*In the Interest of E. M. D.*, 339 Ga. App. 189, 201 (2) (b) (793 SE2d 489) (2016) (citation omitted). The State is required to show that "continued dependency . . . will cause harm. Dependency will cause harm only if all of the options available to DFCS short of termination — keeping the child in foster care, or returning the child to the parent — will themselves cause harm." Id. "[T]he State must show that both would cause harm." Id. This Court has reversed termination orders due to a lack of evidence that the children would experience serious harm if they remained in foster care, even when the State did show that the return of the child to the parent might well cause harm. See id. at 202 (2) (b).

> In considering whether there is evidence that remaining in foster care will cause serious harm to a child, we have examined both (1) the extent to which instability and impermanency are "currently causing specific

22

harms" to the child and (2) whether the parent's current relationship with the child is itself detrimental.

Id. (citation omitted). Significantly, no mental health professional testified at the termination hearing about the mother's mental health (or the children's health), what treatment and counseling she needed, whether she was complying with professional treatment recommendations, whether her mental health caused or was likely to cause specific harm to her children, and whether her relationship with her children was itself detrimental. Compare *In the Interest of H. M.*, 287 Ga. App. 418, 419-422 (651 SE2d 527) (2007).

In its order, the court found "that harm will come to the children absent the implementation of the Department's proposed permanency plan of adoption," and remarked on the generally harmful effects of prolonged foster case. The court made no specific finding that harm would come to these children if they were returned to this mother (although that conclusion is implied, and the court did include findings of fact in another section of the order – as recounted above – as to the mother's noncompliance with case plan requirements). And the court made no specific finding regarding how continuing the status quo would harm the children in this case. See *In the Interest of E. M. D.*, supra; *In the Interest of J. J. S.*, 321 Ga. App. 86, 90-91 (741

23

SE2d 207) (2013) (physical precedent only). While the court did state that one of the children, J. L. J., is bonded with his foster parents and that the foster parents are willing to adopt him, "the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family." *In the Interest of N. T.*, supra at 744 (4) (citation and punctuation omitted).

The trial court's factual findings are insufficient to support a conclusion that the children in this case will be harmed seriously were they to remain in foster care, by virtue of either their relationship with their mother or the impermanency of that situation. See *In the Interest of E. M. D.*, supra; *In the Interest of A. T.*, 271 Ga. App. 470, 473-474 (610 SE2d 121) (2005). And our review of the record does not show by clear and convincing evidence that continued efforts to reunify these children with their mother will cause the children serious physical, mental, emotional, or moral harm. See *In the Interest of N. T.*, supra at 745 (4).

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." *In the Interest of C. S.*, 319 Ga. App. 138, 148 (1) (735 SE2d 140) (2012) (citations omitted). Accordingly, compelling facts are required to terminate

24

parental rights. *In the Interest of M. T. F.*, supra at 148. We note that the juvenile court judge remarked at the end of the termination hearing that this case was a difficult one – one that he "could . . . argue both ways." On the record before us, we cannot conclude that the evidence clearly and convincingly supports terminating the mother's parental rights.

2. Based on the foregoing, we do not reach the mother's remaining contentions.

*Judgment reversed. Barnes, P. J., and McMillian, J., concur.*