**FIFTH DIVISION
PHIPPS, P. J.,
DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 18, 2016**

# In the Court of Appeals of Georgia

A16A1967, A17A0322. IN THE INTEREST OF L. P., J. P., AND P. P.

PETERSON, Judge.

The mother and father of three children, L. P., J. P., and P. P., appeal from the termination of their parental rights. The mother argues that termination of her rights was error because she substantially completed her case goals and her children's dependency was not likely to continue or cause them future harm, and that the juvenile court violated her right to due process by terminating her parental rights despite the Division of Family and Children Services' ("DFCS") failure to file her case plan. The father argues that the juvenile court erred by terminating his parental rights without clear and convincing evidence that the children would be harmed by their continued dependency. We conclude that clear and convincing evidence in the

record supports the juvenile court's findings that the children's dependency is likely to continue and failing to terminate the parents' rights is likely to cause the children serious physical, mental, or emotional harm. Accordingly, we affirm.

Viewed in the light most favorable to the judgment below, *see In the Interest of M. S. S.*, 308 Ga. App. 614, 614 (708 SE2d 570) (2011), the evidence shows that the three children came into the care of DFCS in January 2013 due to the parents' unstable housing and employment and unresolved domestic violence and criminal issues. Later that year, the children were returned to the care of their mother under a protective order. In December 2013, however, DFCS received a report that the mother had been involuntary hospitalized due to mental health issues[1] on the same night the father was arrested for a probation violation. The children then returned to DFCS custody.

When the dependency petition filed by DFCS was heard in March 2014, the mother was incarcerated and the father's whereabouts were unknown. Based on the evidence presented as to the father, and with the consent of the mother, the juvenile court found the children dependent, awarded temporary custody to DFCS, and

---

[1] The mother testified she was hospitalized for drug use, but concedes in her appeal that she was committed for "extreme paranoia" and mental health issues.

ordered the parents to complete a case plan to resolve the dependency issues. Though no case plan appears in the record (and the mother argues hers was never filed ),[2] the juvenile court's order terminating parental rights states that the case plan required the parents to complete a number of tasks, including, but not limited to: (1) obtaining and maintaining stable housing, employment, and income; (2) resolving outstanding criminal issues; (3) attending parenting classes; and (4) completing mental health evaluations. The mother also had to complete a substance abuse evaluation and follow associated recommendations, attend Narcotics Anonymous meetings, and submit to random DFCS drug screens. The father maintained only intermittent contact with DFCS, and was later arrested. The mother cycled in and out of jail for various offenses, including simple battery and possession of methamphetamines.

In June 2014, the juvenile court found that the parents had failed to complete any of the tasks on their case plan and failed to maintain contact with DFCS. Both parents remained incarcerated. DFCS filed a motion for a finding of non-reunification in July 2014, and a petition to terminate parental rights in October 2014. The mother

_____

[2] The mother conceded at her termination hearing that she previously received a copy of her case plan, and that DFCS had reviewed the plan with her and provided her with resources and referrals to complete the plan. DFCS witnesses testified they had previously given copies of the case plan to each parent.

was subsequently released from jail and entered a drug court program. She was sanctioned for missing one drug screen, but DFCS withdrew its motion for non-reunification as to the mother and requested that the termination hearing be held in abeyance due to her substantial compliance in the drug court treatment program and her cooperation with DFCS. In November 2014, the father tested positive for multiple substances on a drug screen, and some time later the court suspended his visitation with the children[3] and further indicated an intention to terminate his parental rights.

On April 30, 2015, the mother tested positive for methamphetamines,[4] but she admitted only to using GHB on a number of occasions since entering the drug court program. The mother was subsequently sanctioned for not disclosing her relapse to DFCS. In July 2015, the mother tested positive for synthetic marijuana, which she denied using, and was removed from the drug court program and then incarcerated.

The juvenile court held its first termination of parental rights hearing for both parents on August 25, 2015. At the hearing, a DFCS supervisor testified that the

---

[3] The court suspended the father's visitation with the children until he enrolled in a substance abuse treatment program and had negative drug screens. The father did not regain visitation with the children before the deprivation hearing.

[4] A DFCS witness testified that the positive drug screen for methamphetamine was a "false positive" because the drug the mother had actually used was GHB. But the mother has not explained why her use of that drug was more legitimate.

4

mother had not obtained stable housing or employment. A separate DFCS witness testified that the children would be harmed if the parents' rights were not terminated because the children would face an uncertain future, which could result in emotional harm, whereas if the termination were granted, their foster family was interested in adopting them. The youngest child had spent nearly the entirety of his childhood with his foster parents, and considered his foster parents to be his mother and father. The juvenile court continued the hearing, finding that it did not have enough evidence to evaluate potential harm to the children or to decide whether termination was in their best interest.

At a subsequent hearing held on November 12, 2015, a psychologist testified as an expert witness regarding his evaluations of the two oldest children, L. P. and J. P. He testified that if the children were left to "linger" in foster care, they could be expected to suffer "some degree of emotional harm," would develop a sense of hopelessness, and would have trouble developing emotional bonds. He did not evaluate the youngest child but testified that a child who is removed from the care of foster parents with whom he has spent the majority of his life would also experience a number of deleterious effects. The expert further noted that L. P. had some behavior problems and fought with J. P. around the time parental visitation resumed. The

expert testified regarding the harm that could result from the children being exposed to domestic violence, drug use, continued incarceration, and lack of stable living arrangements, and stated that "there is a very strong potential that the negative impact can be lasting well beyond just the immediate impact." The expert conceded that if "all of the issues that resulted in harm to the children are cured, then logically, there would be a lower risk of future harm to the children."

The therapist for J. P and L. P. also testified at the later hearing. She testified that the children had been experiencing certain negative emotions associated with the shifting amount of visitation by their parents, and that L. P.'s academic motivation had suffered when visitation with her parents ceased. She further testified that J. P. and L. P. experienced mood shifts and drops in their activity levels and motivation after visitations with their parents. However, overall, the children's emotional states had stabilized while under the care of their foster parents.

The children's foster mother testified that when visits with the parents resumed, J. P. became more argumentative and combative, and had conduct issues at school. L. P. experienced similar troubles at school, and the youngest child, P. P., showed signs of anxiety at being separated from his foster parents. J. P. and L. P. also experienced trouble with their grades when the visits with their parents became

6

irregular, she testified, but once the visits with their parents entirely ceased, their performance stabilized.

At this later hearing, the father, who was on probation, provided proof that he had completed the anger management class and proof of stable housing for the past three months. The father further stated that he had taken some unprescribed pain pills in March but had done some drug and alcohol awareness education since then. The father also testified regarding his employment since his release on probation. A DFCS witness also testified that the father had provided some check stubs and proof of attendance at over twenty Narcotics Anonymous or Alcoholics Anonymous meetings.

The juvenile court entered an order terminating the parental rights of the mother and father. The court cited the lack of stable employment, income, and housing for the parents, continued substance abuse and failure to complete treatment by both parents, the mother's continued incarceration, and the father's history of lack of participation in treatment programs and in the case plan more generally. The court also cited the testimony of the psychologist who testified as to the harm the children were likely to suffer if they were returned to their parents. The parents each filed a motion for a new trial, which the juvenile court denied. The parents then filed timely application for discretionary appeal, which this Court granted.

OCGA § 15-11-310(a) provides that a court considering termination of parental rights first must determine whether at least one of five statutory grounds for termination has been met. Here, the trial court terminated the parent's rights under OCGA § 15-11-310(a)(5), which provides that a ground for termination exists when:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

If it finds that any of the statutory grounds has been met, the juvenile court then shall consider whether termination is in the child's best interest. OCGA § 15-11-310(b). Grounds for termination must be proven by clear and convincing evidence. OCGA § 15-11-320(a). A trial court's order terminating parental rights must "[c]ontain written findings on which the order is based, including the factual basis for a determination that grounds for termination of parental rights exist and that termination is in the best interests of the child[.]" OCGA § 15-11-320(b)(1).

1. The mother first argues that the trial court erred in terminating her parental rights because she substantially completed her case goals and her children's

8

dependency was not likely to continue.[5] In determining that the children were dependent due to lack of proper parental care and control, the trial court relied on the following grounds: (1) "[e]xcessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent of such child incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his or her child"; (2) "[p]hysical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent"; and (3) "whether such parent, without justifiable cause, has failed significantly for a period of six months prior to the date of the termination hearing . . . [t]o comply with a court ordered plan designed to reunite such parent with his or her child." OCGA § 15-11-311(a)(2), (a)(5), (b)(3).

The record shows that, after entering a drug court program, the mother tested positive for methamphetamine and, separately, synthetic marijuana. She denied using either of these substances, and admitted only to using GHB on a number of occasions

---

[5] The father does not challenge the juvenile court's findings of dependency or that it was likely to continue, but rather argues that the evidence was not clear and convincing that the children would likely suffer serious harm. We address that argument in Division 2.

since entering drug court. The mother did not disclose her initial relapse to DFCS as instructed, was removed from the drug court program, and was re-incarcerated.

The mother argues in her appeal that the children's dependency is unlikely to continue because she is completing drug rehabilitation courses while incarcerated. A DFCS witness testified, however, that the mother felt she still needed the structure of in-patient drug treatment. Despite the mother's claim of newfound personal reform, which is for the juvenile court to weigh, the evidence in the record was clear and convincing to support the juvenile court's finding that the mother had continued her pattern of drug use, had not been forthcoming about her ongoing drug issues, and had not been successful in completing a drug treatment program. *See In re T. W. O.*, 283 Ga. App. 771, 776 (1) (a) (iii) (643 SE2d 255) (2007) ("[J]udging the credibility of the parent['s] good intentions was a task for the juvenile court.") (footnote and punctuation omitted); *In re M. N. R.*, 282 Ga. App. 46, 47 (637 SE2d 777) (2006) ("The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.") (citation omitted). The record makes clear that the mother's ongoing drug problem substantially contributed to her inability to provide for the needs of her children, as her incarceration and her related inability to maintain stable housing or employment all stem from her drug use. Where, as here, the

mother's drug use has a deleterious effect on her ability to parent, the juvenile court is justified in finding that the children's dependency was likely to continue.

Without even addressing the two remaining causes for dependency cited by the juvenile court in its order,[6] we find the evidence clearly and convincingly supported the juvenile court's determination that the deprivation was likely to continue. *See In re M. N. R.*, 282 Ga. App. at 47 (dependency was likely to continue where mother admitted she did not complete a drug treatment program, relapsed after completing an earlier program, had positive drug screens, and had not successfully completed a drug treatment program).

2. Both parents argue that there is insufficient evidence that the children's continuing dependency will cause the children serious harm. OCGA § 15-11-310(a)(5) demands that the juvenile court terminate parental rights based on dependency only upon finding by clear and convincing evidence that "the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm" to the child in question. We have long said that a finding that

_____

[6] The mother's failure to follow the case plan was a separate basis for granting termination that we do not reach here, and therefore her remaining argument that the juvenile court deprived her of her due process rights when it failed to file her case plan is moot.

dependency is likely to continue does not necessarily justify a finding of harm, although dependency could support a finding of harm in particular circumstances. *See In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011) (whole court) (analyzing under "deprivation" standard of former Juvenile Code). Rather, in determining whether harm to the child exists, "our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent." *In the Interest of E. M. D., et al.*, No. A16A0986, 2016 WL 6395633, 2016 Ga. App. LEXIS 598, at *8 (II) (B) (Oct. 28, 2016). Thus, the court must assess whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care, and "also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists." *In the Interest of C. L.*, 315 Ga. App. 607, 611-12 (1) (b) (727 SE2d 163) (2012). The State must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be justified. *See E. M. D.*, 2016 WL 6395633, 2016 Ga. App. LEXIS 598, at *8. "Under this framework, whether returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo." *Id.*

12

The juvenile court found that the children would be harmed if returned to their parents because of their parents' inability to provide stability for their children, and because of their substance abuse and past incarceration and domestic violence issues. This finding is supported by the record.

The record also supports a finding that the children would continue to suffer harm under the current arrangement. The expert testified that one of the children, L. P., experienced behavioral problems and would fight with one of her siblings around the time she resumed visits with her parents. The therapist for the two older children, L. P. and J. P., testified that the inconstancy of the visits with their parents had negative consequences on the children, and that the children would experience mood shifts and drops in their activity level and motivation after visits with their parents. The children's foster mother testified that when visits with their parents resumed, J. P. became more argumentative and combative and experienced problems at school, L. P. experienced similar school troubles, and the youngest child, P. P., showed signs of anxiety at being separated from his foster parents. However, these troubles dissipated when visits with the mother and father were discontinued. Finally, the two older children expressed a desire to be adopted by their foster parents, with whom they had bonded, if they could not be returned to their mother and father. The record

13

supported the juvenile court's finding that maintaining the status quo would likely harm the children. *See In re S. A. B.*, 269 Ga. App. 705, 708-09 (605 SE2d 100) (2004) (clear and convincing evidence supported finding that continued deprivation would cause harm where child had developed a positive relationship with his foster parent and expressed his desire to be adopted, and where remaining in foster care would lead to school conduct and academic problems).

*Judgments affirmed. Phipps, P. J., and Dillard, J., concur*.