**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**April 22, 2022**

# In the Court of Appeals of Georgia

A22A0583. IN THE INTEREST OF N. P., a child.

PHIPPS, Senior Appellate Judge.

The mother of minor child N. P. appeals from the juvenile court's order terminating her parental rights. She argues on appeal that: (i) the juvenile court erred by conducting the termination hearing via video conference over her objections; and (ii) the evidence is insufficient to support the court's findings regarding the likelihood of future harm to N. P. if the mother's parental rights are not terminated. For the reasons that follow, we disagree with both contentions and affirm.

N. P. was born in February 2018. Her father's whereabouts are unknown. In January 2019, following an anonymous referral to the Department of Family and Children Services ("DFCS" or the "Department") involving concerns for N. P.'s safety and her mother's mental health, the child was placed into DFCS custody. At

that time, the juvenile court based its initial protective custody order on: (i) findings that the mother had unresolved mental health issues, including bipolar disorder; (ii) reports that "spirits were telling her to kill her child"; (iii) the mother's inadequate housing, lack of electricity, and "minimal" food in her home; and (iv) her refusal to cooperate with the Department's attempts to implement a safety plan. When N. P. entered DFCS custody, she had "excessive" eczema, matted hair, and dirty fingernails; lacked vaccinations; and "appeared to be very much underweight," with "sagging skin" and dark circles around her eyes. Assessments performed around the time of N. P.'s removal revealed delays in expressive communication; sensory issues; an inability to self-calm; and concerns with tactile sensitivity, possibly due to trauma, including a dislike of being dressed or bathed and having her hair brushed or nails cut.

During a February 2019 adjudicatory hearing, the mother admitted that she experienced "hallucinations and blurry-like visions" but denied any mental health issues other than anxiety and attention-deficit / hyperactivity disorder. Based on testimony from a family violence center advocate, a friend of the mother, and the child's maternal grandmother regarding schizophrenia in the mother's family and various unusual behaviors by the mother — including reports that unidentified beings

2

were urging the mother to kill her "evil" baby — the juvenile court again found that the mother had unresolved mental health issues. The court also found that N. P. remained severely underweight and developmentally delayed, that her eczema had not yet resolved, and that she had multiple self-inflicted scabs due to scratching. Consequently, the juvenile court adjudicated N. P. dependent due to abuse and neglect, ordered the mother to submit to a psychological and fitness evaluation, again awarded temporary custody of the child to DFCS, and allowed the mother supervised visitation.

Also around that time, Dr. Jacquelyn Zahm, a psychologist, examined the mother and diagnosed her with bipolar disorder with psychotic features, for which Dr. Zahm recommended psychiatric treatment (to assess potential medication management) and intensive therapy. During a May 2019 dispositional hearing, Dr. Zahm testified that the mother had "experienced prolonged periods of sleep deprivation," as well as "command hallucinations" to harm herself and her child, and had "demonstrated a tendency where she feels strongly compelled to act upon the commands presented by the voices that she hears." Dr. Zahm opined that the mother's struggles put N. P. "at significant risk for maltreatment until the mother makes

progress in mental health treatment to manage her diagnosis" and, on that basis, recommended that the mother's visitation with N. P. be supervised.

In a dispositional order entered following the May 2019 hearing, the juvenile court found that the mother continued to deny any mental health issues and that N. P. remained dependent due to those issues and the mother's medical neglect of the child (as detailed in its prior order). Consequently, the court continued the child's placement with DFCS and again allowed the mother supervised visitation. The court also ordered DFCS to prepare a case plan for reunification, to consist of several goals for the mother, including: (i) demonstrating an ability to meet the child's basic and medical needs; (ii) participating in parent aide services, following recommendations, and demonstrating the skills learned; and (iii) addressing her own mental health needs and following all of Dr. Zahm's recommendations, including submitting to a psychiatric evaluation for medication management, participating in intensive individual therapy, and following the recommendations that resulted from each. A case plan to that effect was entered in May 2019.

Following a June 2019 hearing, the juvenile court entered an "Initial Judicial Review Order" in which it again continued the child's placement with DFCS and allowed the mother to continue visitation. (Capitalization omitted.) Based on

evidence presented at the hearing, the court found that N. P. was doing well in her foster-home placement and was showing reduced tactile hypersensitivity and improved motor and social skills. The child's immunizations and wellness checks were up-to-date, she had gained weight, and her eczema was improving.

The court further found that the mother had submitted to psychological, parental fitness, and domestic violence evaluations by Dr. Zahm. While the mother also had participated in two individual counseling sessions with a therapist, she nevertheless continued to deny "any history, or current symptoms, relating to her mental health." The mother at that time resided in housing obtained through a county family violence center and had not provided proof of employment. The juvenile court determined that, while the mother was "making progress," the child nevertheless remained dependent, as the mother needed "to continue mental health and parenting services" and remained "unable to adequately meet the needs of the child."

Following an October 2019 permanency hearing, the juvenile court found that the mother continued to make progress on her case plan and was participating in individual counseling and parent aide services. And due to positive reports from providers, the mother had begun unsupervised visits with N. P. Nevertheless, the court again continued the child's placement with DFCS to allow the mother to

continue mental health and parenting services needed to address the child's ongoing dependency.

The unsupervised visitation continued for only one month. As a result of parent aide reports that the mother's apartment lacked electricity and that she had engaged in multiple questionable behaviors, her visits with N. P. were required to be supervised again starting in November 2019, following a panel review hearing. DFCS petitioned to terminate the mother's parental rights in August 2020.

During the December 2020 termination hearing, the mother's therapist testified that the mother had participated in 13 counseling sessions since March 2020. During that time, the therapist had observed "a lot of tangential speech, rapid thought processes, [and] difficulty staying focused" — which, according to the therapist, were symptoms related to the mother's bipolar disorder diagnosis — as well as a refusal to accept diagnoses. The therapist also testified that the mother's mental health issues resulted in difficulties in maintaining close relationships and in finding and keeping jobs. Moreover, the mother was not receptive to the therapist's recommendation to engage in "more intensive" therapy.

The therapist further testified that, if bipolar disorder is not managed with therapy and medication (which the therapist "strongly recommend[ed]" for the

6

mother), it can impact a parent's ability to ensure that a child's nutritional, educational, and medical needs are met. According to the therapist, for the mother to make progress in her mental health treatment, she would need to accept "that she has some challenges beyond just anxiety" and that "she has a role in the events that led to the removal of her daughter." However, during the time the therapist had worked with her, the mother had acknowledged only that she experienced anxiety (and only as a result of N. P.'s removal) and refused to take medication prescribed for her bipolar disorder.

A parent aide testified that, during the 20 months she had been working with the mother, the mother had resisted implementing most of the techniques and strategies suggested to her. The parent aide also testified that she at times had difficulty communicating with the mother, whose thoughts did not always "follow in sequence" and could be very "choppy and hard to follow and understand." Nevertheless, regardless of the topic of conversation, the mother regularly "circle[d] back to how she feels as though this case should never have been opened in the first part." In that regard, the mother consistently disagreed with her diagnosis of bipolar disorder and never acknowledged any responsibility for N. P.'s removal from her home. Moreover, between March 2019 and the termination hearing, the mother had

7

seven different jobs, each for no longer than one month. During some of that time, the mother squatted in an unfurnished apartment from which she previously had been evicted, sleeping on a blanket on the floor. The mother told the parent aide that she did not want to work and only sought employment because DFCS required her to do so. When asked whether she had observed any improvements in the mother's parenting, the parent aide responded that she had "seen minimal change in 20 months," during which time she had "continued to work on the same topics" with the mother, who had not implemented the parent aide's advice or shown any growth.

The parent aide further testified that, while N. P. had been excited to see her mother when visitation first began, the child had became more withdrawn during recent visits. Moreover, the mother often spent more than half of her visitation time grooming N. P.'s hair, with the child restrained in a high chair, over the child's objections. The mother also still fed N. P. pureed baby food, although the child had reached an age at which she should have been eating solid foods, despite the parent aide's attempts to change that behavior. The mother similarly was resistant to toilet-training N. P. during visits.

A family support specialist who also provided services to the mother testified that the mother appeared to want to continue to interact with N. P. as though the child

8

were a baby and was unable or unwilling to implement strategies appropriate to N. P.'s development as a toddler. The mother also had difficulty choosing weather-appropriate clothing for N. P. on multiple occasions. According to the specialist, the mother had not made an effort to implement the parenting skills shared with her and did not accept any responsibility for N. P.'s removal.

The executive director of the county family violence center testified that, in December 2018, the mother claimed that spirits in the form of dark shadows in her apartment were directing her to drown N. P., but that she was "not paying attention to them," all of which the mother reported with a "very flat affect, . . . as if this was normal." The director further testified that, while the mother was housed through the family violence center between 2018 and 2020, she failed to comply with program requirements regarding seeking and maintaining employment, attending classes, and ensuring that electricity remained on in her apartment. In late 2019, the mother had no electricity for 21 days in winter, which ultimately led to her eviction from the program's housing. Around that time, she also sometimes spent six or seven hours per day in the center's computer lab, laughing and singing loudly. When asked about her behavior, the mother responded that "she was laying down beats." The mother also was seen dancing in the lobby by herself on one or more occasions. As a result of her

failures to comply with the family violence center's housing program requirements, she will not be eligible for public housing for several years.

N. P.'s DFCS case manager testified that the mother had not completed the goals of her case plan, insofar as she had not maintained stable housing or employment, continued to deny her diagnosis of bipolar disorder, and refused to maintain her medication management treatment and to comply with multiple recommendations for intensive therapy. And while the mother had participated in visitation and parent aide services, she was resistant to learning and direction and had not shown an ability to perform any of the parenting skills taught to her over the course of two years. During at least one supervised visit, the mother repeatedly denied N. P.'s request to use the bathroom, and the case manager had to take the child to the bathroom herself. The mother also had not shown the ability to meet N. P.'s basic or medical needs (as required by her case plan), continued to deny that N. P. was malnourished at the time of her removal, and refused to believe a physician's report that N. P. is not allergic to milk. Moreover, aside from her grandmother — who was planning to move into a nursing home — the mother did not have any relatives willing to provide a home for her and N. P. According to the case manager, until the mother acknowledges the causes of N. P.'s dependency, "there is no way for her to

resolve those issues." And the mother's continued refusal to accept mental health treatment recommended by several providers causes "an increasing amount of concern for the child's safety should she be returned to" the mother.

The case manager also testified that, during N. P.'s time in foster care, she had gained weight to the point that she was only "slightly underweight" as of the date of the termination hearing, her eczema and motor skills had significantly improved, and she was a "happy, healthy child" who was "thriving" with her foster family. N. P. also had bonded with her foster parents — who were ready to adopt her, and who she called "mommy and daddy" — and with her foster siblings.

When asked to identify how the lack of permanency would harm N. P., the case manager explained that it poses a "high risk" of criminal, substance-abuse, "mental, physical, emotional, and social issues," as well as "not meeting educational goals," and that children without permanency "struggle maintaining bonds." The case manager further explained that permanency "can be a primary predictor of how well [a child is] going to do in school and in life." Moreover, according to the case manager, given the mother's resistance to allowing N. P. "to grow and be independent," the child would "significantly regress" if returned to her mother's care.

11

For those reasons, the case manager testified, termination of the mother's parental rights is in N. P.'s best interest.

Dr. Zahm similarly testified that returning N. P. to her mother would raise "serious concerns" for the child's safety if the mother has not demonstrated "mental health stability." In that vein, Dr. Zahm expressed concern that reintroducing the mother to the role of a caregiver to N. P. likely would be a stressor that would increase the likelihood of psychotic symptoms reoccurring. Moreover, Dr. Zahm testified, untreated bipolar disorder in a caregiver "create[s] a significant risk for child maltreatment," and an unwillingness to acknowledge symptoms and engage in treatment further increases that risk. According to Dr. Zahm, such a situation becomes even more concerning where, as here, "no progress has been made in two years." Dr. Zahm also reiterated the host of problems (previously identified by N. P.'s case manager) that N. P. is likely to face absent permanency.

During the mother's testimony at the termination hearing, she appeared to have difficulty staying focused, as she jumped from one subject to another and had to be re-directed to answer the question at hand multiple times. She acknowledged that she had been diagnosed with anxiety, bipolar disorder, and depression, although she claimed to no longer be suffering from depression. The mother also testified that she

did not believe she suffered from bipolar disorder and added, "So I have been told that I'm completely normal." She denied having told others that she heard shadows directing her to drown her child.

The mother testified that she worked for a security company, a job she had started approximately six weeks before the termination hearing, and earned $300 weekly. She also earned approximately $50-$100 weekly working part-time for a meal delivery service. She acknowledged that, since 2018, her employment had been sporadic and that the security job had been the most stable employment she had obtained. The mother further asserted that she wanted to join the military or attend a police academy, although those plans were on hold while she worked on her case plan in these proceedings. The mother conceded that she was $900 in arrears in court-ordered child support as of the date of the termination hearing.

The mother further testified that, at the time of the hearing, she was living with her grandmother, who was planning to move into a nursing home. As a result, the mother had begun looking into referrals for other housing options as well as potentially taking over her grandmother's lease. The mother praised the assistance she had received from her parent aide. She recognized that she had needed assistance learning how to toilet train N. P. and that the parent aide had helped her to provide

13

a more structured routine for her child. She also testified that she did not know that N. P. was underweight at the time of her removal, and she denied that N. P. had been scratching herself or had sagging skin at that time.

At the conclusion of the termination hearing, N. P.'s guardian ad litem recommended that the mother's parental rights be terminated, primarily based on her "lack of acceptance and responsibility . . . and a unwillingness to change." The Department similarly asked the juvenile court to terminate the mother's parental rights.

In its termination order, the juvenile court found that the mother had not substantially complied with her court-ordered case plan. Although she had completed certain evaluations and participated in some services, the mother had neither complied with recommendations from treatment providers nor made any behavioral changes showing that she had resolved the issues giving rise to N. P.'s dependency, and, as a result, she continued to lack the ability to meet the child's basic needs. In that regard, the court found, the mother had not shown an ability to become self-sufficient or otherwise maintain stable and adequate housing, employment, or income. And while the mother was living with a grandmother at the time of the hearing, she

did not have a housing plan for when the grandmother made her planned move into an assisted living facility.

The juvenile court highlighted that "the mother's unresolved mental health issues and her lack of understanding and acceptance regarding the child's issues upon entry into foster care" were of "utmost concern" in this case and that the mental health issues negatively impacted the mother's parenting ability. In particular, the court found that, while the mother suffers from bipolar and anxiety disorders — which have negatively affected her ability to maintain close relationships and employment and to accept responsibility for her actions — she continues to deny diagnoses, refuses to take prescribed medication, and has not made progress in therapy or otherwise complied with her health providers' recommendations. The court also highlighted that the mother's behavioral and mental health concerns had resulted in the termination of unsupervised visitation with N. P.

Based on the above findings, the juvenile court determined that the mother has not shown "the ability to provide attentive care, security, and stability to the child" and that N. P. will suffer harm if she is returned to the mother's custody or continues in a parental relationship with the mother while in foster care. In that vein, the court found that N. P. will be "at significant risk for regression and medical neglect if

returned to the mother's custody" and that "the mother's continued instability also renders it very difficult for her to provide a safe and secure environment for the child." The court concluded that, based on the testimony of Dr. Zahm, there is a significant risk that the mother will experience psychotic symptoms in the future, particularly if she takes on the added stress of returning to a caregiver role.

The juvenile court further found that N. P. is "thriving" in her foster-care placement "and is expected to thrive if she remains there" and that her foster parents — to whom the child refers as "her parents" — intend to adopt her. Moreover, because the child "is extremely bonded with the current placement," it would be detrimental to remove her from that placement or for "the child to remain in foster care without achieving permanency through adoption." In that regard, the court highlighted Dr. Zahm's testimony as to the myriad negative effects a lack of permanency is likely to have on a child in N. P.'s position.[1] As a result, the court found that by continuing in foster care without permanency, N. P. "would be at risk of regression in her health, development, and behavior," "will have issues forming attachments and bonds with caregivers," and is likely to experience "delinquency

---

[1] As discussed above, N. P.'s case manager also provided similar testimony to that effect.

issues, relationship issues, and educational issues in the future." Consequently, the court concluded that it is in N. P.'s best interest to remain in her current placement. The juvenile court also noted that both the guardian ad litem and court-appointed special advocate recommended termination of the mother's parental rights.

Based on the above findings, the juvenile court concluded that N. P. remains dependent as a result of lack of proper parental care by her mother due to: (i) the mother's medically verified deficiency of her physical, mental, or emotional health that renders her unable to provide adequately for N. P., (ii) the mother's physical, mental, or emotional neglect of the child, and (iii) the mother's failures to develop and maintain a meaningful and supportive parental bond with N. P., to provide for N. P.'s care and support as required by law or judicial decree, and to comply with the court's plan to reunite the mother and child. Moreover, the court found, reasonable efforts to remedy the circumstances of dependency have been unsuccessful, the dependency likely will continue or remain unremedied in the reasonably foreseeable future, and continuation of dependency without permanency would harm the child. The court further determined that permanency is in the child's best interest and that there is no possibility of permanency with the mother or the child's unknown father. Moreover, given the ongoing dependency, the child would be at a significant risk of

harm if returned to the mother's custody. On those grounds, the court terminated the mother's parental rights as to N. P. We subsequently granted the mother's application for discretionary review, see *In the Interest of N. P.*, Case No. A22D0086 (Oct. 25, 2021), and this appeal followed.

1. On appeal, the mother first contends that the juvenile court erred by conducting a virtual termination hearing by video conference (via "Zoom"[2]) over her objections. By doing so, she maintains, the court violated OCGA § 15-11-19 (a) and imposed an undue burden on her.[3] We discern no reversible error.

The termination hearing in this case was conducted on December 2 and 3, 2020. At that time, the Supreme Court of Georgia Chief Justice's March 14, 2020 Order Declaring Statewide Judicial Emergency,[4] as extended by the Chief Justice's

---

[2] "Zoom" is an internet-based platform for video and audio teleconferencing.

[3] Although the mother's counsel briefly referred to the Confrontation Clause during his objections to proceeding virtually, the mother does not raise any Confrontation Clause or Sixth Amendment challenges on appeal.

[4] https://www.gasupreme.us/wp-content/uploads/2020/03/CJ-Melton-amended-Statewide-Jud-Emergency-order.pdf (Mar. 14, 2020); see *Copeland v. Copeland*, 361 Ga. App. 125, 127, n. 3 (863 SE2d 509) (2021) ("On March 14, 2020, . . . citing the public health emergency presented by the COVID-19 pandemic, Supreme Court of Georgia Chief Justice Harold Melton issued an order declaring a statewide judicial emergency. Among other things, the judicial emergency declaration suspended, tolled, extended and otherwise

18

November 9, 2020 Eighth Order Extending Declaration of Statewide Judicial Emergency ("Eighth Extension"),[5] was in effect. See generally OCGA § 38-3-60 et seq. Pursuant to the terms of the Eighth Extension, all Georgia courts were directed to: (i) "continue to conduct proceedings, remotely or in-person, in compliance with public health guidance, applicable statutes and court rules, and the requirements of the United States and Georgia Constitutions, including the public's right of access to judicial proceedings"; and (ii) "continue to use and increase the use of technology to conduct remote judicial proceedings as a safer alternative to in-person proceedings, unless required by law to be in person or unless it is not practicable for technical or other reasons for persons participating in the proceeding to participate remotely." Eighth Extension at 2-3. In light of the judicial emergency orders, we review for abuse of discretion the trial court's decision to conduct the termination hearing via video conference. See *Copeland v. Copeland*, 361 Ga. App. 125, 130 (2) (863 SE2d 509) (2021) (the judicial emergency orders "vested trial courts with broad discretion as to how and when they will conduct hearings and trials").

---

granted relief from any deadlines or time schedules in civil and criminal cases. The order was set to expire on April 13, 2020, but was extended several times . . . .").

[5] https://www.gasupreme.us/wp-content/uploads/2020/11/Eighth-Order-Extending-Declaration-of-Statewide-Judicial-Emergency_As-Issued.pdf (Nov. 9, 2020).

19

OCGA § 15-11-19 (a), which applies to juvenile court proceedings, see generally OCGA Title 15, Chapter 11, provides:

A party has the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records, and to appeal the orders of the court; provided, however, that the court shall retain the discretion to exclude a child from any part or parts of any proceeding under Article 3 of this chapter if the court determines that it is not in such child's best interests to be present. An attorney for an excluded child shall not be excluded from the proceedings.

The mother argues that, by conducting a virtual hearing, the juvenile court violated her right under that statute "to be present, in person, in the courtroom while the court heard testimony and decided whether to permanently sever her legal rights to her child." However, the mother has not cited, and research has not revealed, any authority standing for the proposition that the "right to be present" under OCGA § 15-11-19 (a) may not be satisfied by conducting a hearing via video conference. Cf. *In the Interest of B. G.*, 225 Ga. App. 492, 492-494 (1) (484 SE2d 293) (1997) (a trial court may not exclude a parent from the courtroom while the court receives in-person testimony by the parent's children during a termination hearing because doing so

20

prevents the parent from confronting the witnesses against her and assisting her attorney in propounding questions and countering allegations against her).

Notably, Uniform Juvenile Court Rule ("UJCR") 12.2 expressly provides that "any juvenile court matter" other than certain delinquency and protective order proceedings "may be conducted by video conference," so long as the video conferencing system conforms to certain minimum requirements. UJCR 12.2 (a), (e). Moreover, the rule explicitly contemplates application in proceedings to terminate parental rights, insofar as the rule governs notices of intent to present witnesses by video conference in such proceedings. UJCR 12.2 (c) (1) (c). On appeal, the mother does not assert that the juvenile court violated any of these provisions during her termination hearing.

Importantly, the mother also has not identified any harm that she suffered as a result of the virtual termination hearing. Although she generally contends that she experienced "technical issues affecting her ability to see or hear the witnesses and court" and that certain witnesses experienced "issues during the trial with audio or video functions," she elaborates no arguments as to how any such issues impacted her or her counsel's ability to effectively present her case and cross-examine witnesses. And while the mother also maintains that she "was unable to communicate with

21

counsel during trial and could not provide information or documents to her counsel," she does not identify any such information or documents — much less how they would have impacted the outcome of the proceeding — in her appellate brief.[6] Moreover, the termination hearing transcript indicates that the mother and her counsel were able to exchange text messages during the hearing. Similarly, during the termination hearing, the mother's attorney did not identify any issues related to her objection to proceeding via video conference that were specific to her hearing, aside from a general concern regarding ensuring that "different cultures" to be discussed during the hearing were "afforded the same formality within the courtroom," upon which counsel did not further elaborate.

Finally, the juvenile court found that "the mother's attorney did not allege any connectivity issues or any other issues after the first witness was sworn in and the trial began" and that "[t]he mother was connected to Zoom and present for the entire

---

[6] During the hearing on the mother's motion for a new trial, her trial counsel similarly testified, without elaboration, that he and the mother "did have issues communicating just because it's different than sitting at a table where somebody can speak right away." And although trial counsel agreed that the mother "wouldn't have been able to give . . . anyone . . . documents" during the virtual termination hearing, he did not identify any specific documents that the mother sought to share with him but could not. Instead, counsel simply testified, again without elaboration, that "it would've been a better defense had it been in person."

[h]earing."[7] The mother does not identify any record evidence calling these findings into question. Consequently, she has not met her burden of showing that the juvenile court committed reversible error by conducting the termination hearing via video conference in this case.

2. The mother also contends that the evidence was insufficient to support the juvenile court's findings that N. P.'s continued dependency will cause or is likely to cause her serious physical, mental, emotional, or moral harm; that N. P. will suffer serious harm if returned to her mother; or that the current relationship between N. P. and her mother is harmful. We disagree.

On appeal from a termination order, we view the evidence in the light most favorable to the juvenile court's ruling to determine "whether any rational trier of fact could have found by clear and convincing evidence that the parent's rights should be terminated." *In the Interest of C. A. B.*, 347 Ga. App. 474, 475 (819 SE2d 916) (2018). This Court "do[es] not weigh the evidence or determine the credibility of the witnesses but defer[s] to the trial court's factfinding and affirm[s] unless the evidence

---

[7] In that regard, at the beginning of the hearing, the juvenile court instructed the mother's counsel to let the court know if any specific issues arose that implicated the mother's ability to participate in the hearing. The mother has pointed to no record evidence that counsel raised any such issues after the court's instruction.

fails to satisfy the appellate standard of review." *In the Interest of S. L. B.*, 265 Ga. App. 684, 684 (595 SE2d 370) (2004) (citation and punctuation omitted).

In deciding whether to terminate one's parental rights, a juvenile court first must determine whether one of five statutory grounds for termination has been met, including the ground on which the court relied in this case:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and:
>
> (A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; or
>
> (B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

OCGA § 15-11-310 (a) (5).

The mother's appellate challenges are focused on the last part of this rubric — harm to the child. She contends that the evidence was insufficient to show that either

returning N. P. to her care or continuing the parent-child relationship likely will cause serious harm to her child.[8]

> [I]n determining whether harm to the child exists, our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent. Thus, the court must assess whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care, and also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation[9] persists. The State must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be justified. Under this framework, whether returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo.

*In the Interest of L. P.*, 339 Ga. App. 651, 656-657 (2) (794 SE2d 252) (2016) (citations and punctuation omitted); see *In the Interest of A. S.*, 339 Ga. App. 875, 881

---

[8] The final part of the analysis under the juvenile code requires the court to determine whether termination is in each child's best interest by considering several statutory factors. See OCGA § 15-11-310 (b), cross-referencing OCGA § 15-11-26. On appeal, the mother does not challenge the juvenile court's ruling that termination is in N. P.'s best interest.

[9] The term "dependency" in the new juvenile code is analogous to the term "deprivation" under the old juvenile code. See OCGA § 15-11-2 (22); *In the Interest of J. A. B.*, 336 Ga. App. 367, 368, n. 2 (785 SE2d 43) (2016).

25

(3) (794 SE2d 672) (2016) (for a court to terminate parental rights based on dependency, the State must establish both: (i) that a child is likely to be harmed if returned to her parents; and (ii) that the child is likely to be harmed if she remains indefinitely in foster care); accord *In the Interest of E. M. D.*, 339 Ga. App. 189, 201-203 (2) (b) (793 SE2d 489) (2016); see also *In the Interest of R. S. T.*, 345 Ga. App. 300, 310 (3) (812 SE2d 614) (2018) (physical precedent only).

While a finding that dependency is likely to continue "does not necessarily justify a finding of harm," dependency may support a finding of harm under certain circumstances. *In the Interest of L. P.*, 339 Ga. App. at 656 (2); see also *In the Interest of B. W.*, 287 Ga. App. 54, 63 (2) (651 SE2d 332) (2007) (the same facts that support a conclusion that a child's deprivation is likely to continue if returned to the parent may also support a conclusion that continued deprivation likely will cause the child serious harm); accord *In the Interest of A. K.*, 272 Ga. App. 429, 437 (1) (d) (612 SE2d 581) (2005). In determining whether continued dependency is likely to cause harm to a child, a juvenile court may consider "the adverse effects of prolonged foster care" and "[a] caseworker's testimony about the need for permanency," insofar as "[i]t is well established that children need permanence of home and emotional

stability or they are likely to suffer serious emotional problems." *In the Interest of A. K.*, 272 Ga. App. at 438 (1) (d).

Here, the juvenile court's findings as to the causes of N. P.'s dependency, the likelihood that such dependency will continue, and future harm to the child resulting from dependency are all intertwined, as they are all premised primarily on the mother's unresolved, ongoing mental health issues. And given the evidence discussed above, the juvenile court was authorized to conclude that N. P. likely will suffer future harm if returned to her mother in light of: (i) the mother's refusals to (a) acknowledge and seek treatment for her bipolar disorder diagnosis and (b) acknowledge her responsibility for the circumstances that led to N. P.'s removal in the first instance; (ii) the testimony of her therapist that the failure to manage bipolar disorder with therapy and medication can impact a parent's ability to ensure that a child's needs are met; and (iii) testimony by the child's case manager to the effect that the child is likely to regress if returned to her mother's care. See *In the Interest of D. D. B.*, 263 Ga. App. 325, 328 (1) (c) (587 SE2d 822) (2003) (a parent's unwillingness to consistently treat serious mental health issues may support a determination that deprivation is likely to continue and harm the child).

27

Those same factors similarly authorized the juvenile court to conclude that continuing the parent-child relationship while N. P. remains in foster care also is likely to harm the child, as there currently appear to be little-to-no prospects that the mother will obtain the treatment necessary to render her capable of providing for the child's needs anytime in the foreseeable future. The juvenile court likewise was authorized to find that N. P.'s lack of a bond with her mother and noticeable change in demeanor in her mother's presence further supported a determination that the child likely will suffer harm under the status quo, a determination that also was supported by the testimony of Dr. Zahm and N. P.'s DFCS case manager as to how a lack of permanency is likely to harm the child. See *In the Interest of L. P.*, 339 Ga. App. at 657 (2) (concluding that the record supported a finding that maintaining the status quo likely would harm the children where they experienced behavioral problems following visits with their parents, but those problems dissipated when visits were discontinued); *In the Interest of C. L.*, 315 Ga. App. 607, 612 (1) (b) (727 SE2d 163) (2012) (observing that we have recognized "in case after case[] that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems"); accord *In the Interest of B. W.*, 287 Ga. App. at 67 (7).

28

For each of the above reasons, clear and convincing evidence supports the juvenile court's rulings as to future harm, and we affirm the court's order terminating the mother's parental rights as to N. P.

*Judgment affirmed. Doyle, P. J., and Reese, J., concur.*