**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 3, 2025**

# In the Court of Appeals of Georgia

A24A1448. IN THE INTEREST OF R. E. M. B., a child.

DOYLE, Presiding Judge.

We granted the application for discretionary appeal of R. E. M. B.'s mother to review her claim that the evidence was insufficient to support the juvenile court's termination of her parental rights to R. E. M. B.[1] For the reasons that follow, we affirm.

Construed in favor of the judgment,[2] the evidence presented to the juvenile

---

[1] The father did not appeal this termination, and this appeal does not address any issues relating to the father.

[2] See *In the Interest of D. C. S.*, 371 Ga. App. 186, 187 (1) (899 SE2d 834) (2024) ("On appeal from an order terminating parental rights, we review the evidence in the light most favorable to the juvenile court's judgment in order to determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.") (punctuation omitted), quoting

court shows that R. E. M. B. was born in February 2019. In April 2022, R. E. M. B. was removed from her mother's custody after being left unattended in a vehicle for an hour-and-a-half in 107-degree heat. R. E. M. B. was hospitalized for hyperthermia, the mother was arrested and charged with aggravated child abuse, and R. E. M. B. was placed in foster care. One of the conditions of the mother's bond was no contact with R. E. M. B.

In May 2022, R. E. M. B. was adjudicated dependant based on the hyperthermia incident and the mother's consent. The Division of Family and Children Services ("DFCS") issued the mother a reunification plan requiring her to maintain stable housing and income, pay child support, complete psychological and parental fitness assessments, take parenting classes, attend therapy, and demonstrate her parental abilities in supervised visits with R. E. M. B. The mother initially satisfied some of these requirements, but in October 2022, she was unemployed, had not paid any child support, and had not had any contact with R. E. M. B. due to her bond condition.

Nevertheless, the mother got the no contact provision of her bond lifted in February 2023, and she began supervised visits with R. E. M. B. in April 2023; however, she was still unemployed and had paid no child support. In May 2023, the

---

*In the Interest of E. M.*, 347 Ga. App. 351, 354 (2) (819 SE2d 505) (2018).

mother gave birth to another child. In September 2023, DFCS petitioned to terminate the mother's parental rights on the grounds that the mother had subjected R. E. M. B. to aggravated circumstances related to the 2022 incident, had failed to complete the requirements of her case plan, including maintaining stable housing and income and paying child support, had ongoing mental health issues compromising her parenting abilities, and had no parental bond with R. E. M. B., who had developed a stronger bond with her foster parents than with the mother.

The juvenile court convened a hearing on the termination petition in January 2024. The mother testified that she had not paid any child support, but contended that she only had part-time employment making only about $650 per month, which she admitted was not enough to cover rent and other expenses. She testified that although her boyfriend provided financial assistance, he did not live with her and wanted no involvement in the process of regaining custody of R. E. M. B. She also testified that she was unable to care for R. E. M. B. on her own.

Regarding the mother's mental health, the juvenile court heard testimony indicating that the mother was diagnosed with borderline personality disorder with psychotic features, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder and that the mother was not taking her prescription

medications. Among the symptoms of these untreated mental health issues were blackout spells that could last for days, during which the mother had no recollection of her actions.[3]

Regarding R. E. M. B.'s needs, the juvenile court heard testimony that R. E. M. B. was diagnosed with disinhibited social engagement disorder,[4] mixed receptive-expressive language disorder,[5] and global developmental delay. Due to these disorders, R. E. M. B. required a higher level of supervision than is typical for a child of her age, and the mother testified that she lacked the capacity to fully handle R. E. M. B.'s psychological issues.

The family therapist for the mother and R. E. M. B. testified that the mother

---

[3] The mother reported having such an episode when R. E. M. B. was removed from her custody in April 2022.

[4] According to the family therapist, disinhibited social engagement disorder refers to a pattern of behavior in which a child actively approaches and interacts with unfamiliar adults and exhibits overly familiar verbal or physical behaviors, diminished or absent checking back with adult caregivers when venturing away, even in unfamiliar settings, and willingness to go with unfamiliar adults with minimal or no hesitation. The family therapist testified that the disorder results from extreme neglect or deprivation, and treating it requires a stable environment, a predictable routine, and a healthy bond with caregivers.

[5] According to the family therapist, mixed receptive-expressive language disorder refers to an inability to fully comprehend the words of others and express oneself verbally.

had attended only ten of the eighteen scheduled sessions and was late to three of the sessions she attended. The mother's irregular attendance record contributed to her inability to manage R. E. M. B.'s special needs. Additionally, the family therapist observed that the bond between the mother and R. E. M. B. was compromised to the extent that the mother often ignored or responded inappropriately to R. E. M. B., and R. E. M. B. frequently displayed concerning aggressive behaviors toward the mother. A social worker who performed an assessment of the bond between the mother and R. E. M. B. echoed these concerns and testified that their bond did not reflect a healthy parental attachment.

The parental aide tasked with imparting parenting skills to the mother testified that the mother participated in only five of the approximately nineteen planned home visits. She testified that during the home visits that did occur, the mother appeared not to understand or internalize basic instructions. The mother initially was cooperative in setting up these visits but eventually became unreachable, causing the services to terminate.

Another parental aide testified that the mother was often late to or missed supervised visits with R. E. M. B. due to the mother's confusion. At the visits, the mother did not consistently provide the structure and individual attention R. E. M. B.

needed to develop, and the mother was not able to properly divide her attention between the newborn and R. E. M. B., attending to one at the expense of the other when the newborn was present.

R. E. M. B.'s foster mother testified that when R. E. M. B. first came into her care, she was nonverbal, not potty-trained, and got kicked out of her first daycare for biting; however, after living with her foster parents for two years, R. E. M. B.'s behavior and communication improved.[6] The foster parents provided R. E. M. B. a secure, structured environment in which she thrived, and R. E. M. B. had developed strong bonds with her foster family, who intended to adopt her.

In February 2024, the juvenile court entered an order terminating the mother's parental rights to R. E. M. B. Based on the mother's failure to pay any child support since R. E. M. B. was adjudicated dependent in May 2022, the juvenile court found by clear and convincing evidence that the mother had wantonly and wilfully failed to comply with a court-ordered child support decree for more than 12 months, thus warranting termination of her parental rights pursuant to OCGA § 15-11-310 (a) (3).

Additionally, the juvenile court found by clear and convincing evidence that R. E. M. B. was dependent, that reasonable efforts to remedy the circumstances

---

[6] R. E. M. B.'s behaviors regressed when she started having visits with her mother in April 2023.

surrounding the dependency had failed, that the cause of R. E. M. B.'s dependency was unlikely to be remedied in the reasonably foreseeable future, that returning to her mother would likely cause R. E. M. B. serious mental or emotional harm, and that the continuation of the parent and child relationship between R. E. M. B. and the mother was likely to cause R. E. M. B. serious physical, mental, or emotional harm, warranting termination of the mother's parental rights under OCGA § 15-11-310 (a) (5). In support of these findings, the juvenile court cited: (1) the mother's failure to maintain stable housing and income necessary to meet R. E. M. B.'s needs; (2) the mother's inability to safely manage R. E. M. B.'s special needs diagnoses; (3) the mother's inability to attend to both her newborn and R. E. M. B. simultaneously, even in the controlled environment of a supervised visit; (4) the lack of a healthy parental bond between R. E. M. B. and her mother; (5) the mother's inconsistent attendance at her family therapy and parental aide appointments; and (6) the fact that the mother had left R. E. M. B. in a hot car, resulting in hospitalization of the child and arrest of the mother.

The juvenile court concluded that termination of the mother's parental rights was in R. E. M. B.'s best interests in consideration of the statutory factors of OCGA § 15-11-310 (b) and because her foster parents, who were capable of safely managing

her special needs and with whom she had bonded significantly, intended to adopt her. We granted the mother's application for discretionary review, and this appeal followed.

1. The mother contends that insufficient evidence was presented to warrant termination of her parental rights. We disagree.

> The decision to terminate parental rights is a two-step process. The court must first determine whether any of five statutory grounds have been met, including the [two] grounds upon which the court relied in this case: (1) the parent failed to comply with a child support order for more than twelve months; . . . or ([2]) the child is considered dependent due to a lack of proper care or control by the parent and other statutory considerations are present. See OCGA § 15-11-310 (a). These grounds are independent, and thus, on appeal, if there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm. If one of the above grounds has been established, the juvenile court shall then consider whether termination of parental rights is in the child's best interest. See OCGA § 15-11-310 (b).[7]

(a) *Failure to comply with a child support order under OCGA § 15-11-310 (a) (3).* Regarding the juvenile court's finding under OCGA § 15-11-310 (a) (3), it is undisputed that the mother had not made any child support payments since R. E. M.

---

[7] (Citation and punctuation omitted.) *In the Interest of C. A. B.*, 351 Ga. App. 666, 671-672 (2) (832 SE2d 645) (2019).

B. was adjudicated dependent in May 2022. At that time, the juvenile court ordered the mother to pay $45 per week in child support and notified her that failure to do so could result in termination of her parental rights. The mother admitted that she had failed to provide any support for R. E. M. B. through the date of the final hearing in January 2024, some 19 months after the date of the court order requiring her to make child support payments. Further, the mother testified that she had a job for at least part of this period, was financially supported by her boyfriend, and received roughly $1,300 in excess educational financial aid each semester that she could have used to support R. E. M. B. "Accordingly, clear and convincing evidence supported the juvenile court's conclusion that the [mother wantonly and wilfully failed to comply for a period of 12 months or longer with the court's child support decree, warranting termination of the m]other's parental rights . . . under OCGA § 15-11-310 (a) (3)."[8]

(b) *Dependent child under OCGA § 15-11-310 (a) (5).* Although we are not required to do so, we exercise our discretion to review the mother's challenge to the termination of her parental rights under OCGA § 15-11-310 (a) (5).

---

[8] *In the Interest of D. C. S.*, 371 Ga. App. at 196-197 (2) (a) (holding that 14 months of missed child support payments supported termination of the mother's parental rights). Accord *In the Interest of E. M.*, 347 Ga. App. 351, 357 (2) (a) (819 SE2d 505) (2018) (holding that a mother's failure to pay any child support over a 16-month period supported termination of her parental rights) (collecting cases).

To justify termination of parental rights under OCGA § 15-11-310 (a) (5), the following factors must be satisfied:

A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and:

(A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; or

(B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

(i) *Dependency*. The juvenile court adjudicated R. E. M. B. dependent in May 2022, and the mother did not appeal this order. Accordingly, the mother cannot challenge this finding.[9]

(ii) *Lack of parental care or control as cause of the dependency*. The record here shows dependency based on a lack of proper parental care and control in three

[9] See *In the Interest of S. W.*, 363 Ga. App. 666, 670 (1) n. 4 (872 SE2d 316) (2022) ("[U]nappealed dependency orders are binding in separate actions to terminate parental rights.").

respects. First, the mother suffers from severe mental illnesses that, combined with R. E. M. B.'s additional needs, prevent her from properly caring for R. E. M. B.[10] The mother was diagnosed with borderline personality disorder with psychotic features, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder, but the mother is noncompliant with her prescription medication regimen. One of the symptoms of the mother's untreated conditions is blackouts during which the mother has no recollection of events, and the mother reported that she experienced a blackout episode when she left R. E. M. B. in the hot car, the very event precipitating R. E. M. B.'s removal from the mother's custody and R. E. M. B.'s dependency adjudication.[11]

Moreover, the mother has not cultivated a healthy parental bond with R. E. M. B.[12] The mother was prohibited by court order from having contact with R. E. M. B.

---

[10] See OCGA § 15-11-311 (a) (1).

[11] See *In the Interest of T. A.*, 279 Ga. App. 377, 379-380 (631 SE2d 399) (2006) (holding that evidence that a mother with a mental condition preventing her from caring adequately for her child and who neither attended counseling sessions nor took medication prescribed for her mental illness as required by her case plan supported the juvenile court's conclusion that the child's deprivation was caused by a lack of proper parental care); *In the Interest of B. J. F.*, 276 Ga. App. 437, 441 (1) (b) (623 SE2d 547) (2005) ("A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination.") (punctuation omitted).

[12] See OCGA § 15-11-311 (b) (1).

for a year after R. E. M. B.'s removal. But after the mother began supervised visits with R. E. M. B., the social worker who assessed the bond between R. E. M. B. and the mother testified that the bond, while present, did not reflect a healthy parental attachment, and the family therapist testified that the bond was compromised and characterized by a lack of trust, which contributed to the mother's inability to adequately meet R. E. M. B.'s needs.

Finally, the mother did not comply with the terms of her court-ordered reunification plan.[13] As noted above, the mother never paid child support as required. She also ignored the recommendations following her psychological assessment by refusing to take her medication as prescribed. And she largely disregarded the requirement of participation in family therapy and parental aide sessions. The family therapist testified that, due in part to her irregular attendance, the mother was not able to demonstrate the ability to meet R. E. M. B.'s heightened parental needs. And the mother's interactions with the home parental aide degenerated to the point that the services had to be terminated.[14] Thus, clear and convincing evidence supported the

---

[13] See OCGA § 15-11-311 (b) (3).

[14] See *In the Interest of B. J. F.*, 276 Ga. App at 441 (1) (b) (holding that a "mother's failure to comply with her reunification case plan goals may be a factor in concluding that her inability to care for her child was the cause of his deprivation") (punctuation omitted).

juvenile court's determination that R. E. M. B.'s dependency was due to a lack of proper parental care and control.

(iii) *Reasonable efforts to remedy the circumstances.* Clear and convincing evidence also supported the juvenile court's finding that reasonable efforts to remedy the circumstances leading to the dependency had failed. DFCS issued the mother a comprehensive reunification plan including referrals for a psychological evaluation, therapy sessions, parenting courses, and parental aide services. Although the mother made partial progress toward completing some of the goals in her reunification plan by utilizing these services, she was unable to demonstrate that she could successfully meet R. E. M. B.'s parental needs, even with these resources.

(iv) *Cause of the dependency is likely to continue.* The juvenile court's finding that the cause of R. E. M. B.'s dependency was unlikely to be remedied in the reasonably foreseeable future was supported by clear and convincing evidence. In assessing whether a child's dependency is likely to continue, "[c]ourts are clearly authorized to consider the special needs of a child and the parent[']s[] inability or unwillingness to provide for those needs."[15] R. E. M. B. has a high level of special needs, and the mother struggles with her own diagnoses. While the mother expressed willingness to

---

[15] (Punctuation omitted.) *In the Interest of D. B.*, 306 Ga. App. 129, 137 (1) (701 SE2d 588) (2010).

care for R. E. M. B., she admitted that, by herself, she was presently unable to care for R. E. M. B. and ill-equipped to fully handle R. E. M. B.'s psychological issues.[16] And the mother's refusal to treat the mental health issues that led to R. E. M. B.'s dependency is an especially strong indicator that the dependency is likely to continue.[17]

(v) *Return to parent and continuation of parent-child relationship likely to cause serious harm*. Clear and convincing evidence supported the juvenile court's findings that R. E. M. B.'s return to her mother and continuation of the parent-child relationship is likely to cause R. E. M. B. serious physical, mental, or emotional harm.

> In determining whether harm to the child exists, our law requires a juvenile court to consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent. Thus, the court must assess whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care,

---

[16] See *In the Interest of T. A.*, 331 Ga. App. 92, 95 (2) (c) (769 SE2d 797) (2015) ("The test in determining termination of parental rights . . . is whether the mother, *ultimately standing alone*, is capable of mastering and utilizing the necessary skills to meet her parenting obligations.") (punctuation omitted; emphasis in original).

[17] See *In the Interest of D. D. B.*, 263 Ga. App. 325, 328 (1) (c) (587 SE2d 822) (2003) (explaining that a mother's unwillingness to consistently treat her mental health condition may support a determination that a child's deprivation is likely to continue).

and also the likelihood of harm if the child returns to the custody of [her] parent, notwithstanding that the deprivation persists. The State must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be justified. Under this framework, whether returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo.[18]

"While a finding that dependency is likely to continue does not [always] justify a finding of harm, dependency may support a finding of harm under certain circumstances."[19]

Here, the juvenile court's findings as to the causes of R. E. M. B.'s dependency, the likelihood that such dependency would continue, and future harm to R. E. M. B. resulting from the dependency are intertwined to the extent that they are based mainly on the mother's unresolved, ongoing mental health issues. Given the evidence discussed above, the juvenile court was authorized to conclude that R. E. M. B. would likely suffer future harm if returned to her mother in light of the mother's unwillingness to treat her mental health issues in order to remediate the circumstances

---

[18] (Punctuation omitted.) *In the Interest of N. P.*, 363 Ga. App. 879, 891-892 (2) (872 SE2d 501) (2022), quoting *In the Interest of L. P.*, 339 Ga. App. 651, 656-657 (2) (794 SE2d 252) (2016).

[19] (Punctuation omitted.) *In the Interest of N. P.*, 363 Ga. App. at 892 (2).

that led to R. E. M. B's removal in the first place. The family therapist testified that the mother lacked the ability to meet R. E. M. B.'s needs and that, considering R. E. M. B.'s heightened special needs and the mother's mental health issues, a return to her mother's care would be risky and detrimental to R. E. M. B.'s well-being.

Likewise, these factors authorized the juvenile court to conclude that continuing the parent-child relationship while R. E. M. B. remains in foster care is also likely to harm the child, as there is no indication that the mother intends to obtain the treatment necessary to render her capable of providing for R. E. M. B's needs in the foreseeable future. The lack of a healthy parental bond between R. E. M. B. and her mother and R. E. M. B.'s behavioral regression following visits with her mother further supported the determination that R. E. M. B. will likely suffer harm under the status quo.[20] Accordingly, clear and convincing evidence supports the juvenile court's findings as to future harm.

(c) *Best interests.* "[T]he same factors showing the existence of parental misconduct or inability can support a finding that termination of parental rights would be in the child's best interest. And, when considering the best interest of the child, the

---

[20] See *In the Interest of L. P.*, 339 Ga. App. at 657 (2) (concluding that the record supported a finding that maintaining the status quo would likely cause serious harm to children because their behaviors regressed following parental visits but improved when the visits were discontinued).

juvenile court may also consider the child's need for a stable and permanent home environment."[21] Here, the collective evidence provided a sufficient basis for the juvenile court to conclude that termination of the mother's parental rights was in R. E. M. B.'s best interests. The record reflects that R. E. M. B. is strongly bonded with her foster family, who have proven capable of providing R. E. M. B. the structure, safety, and stability she needs, particularly in light of her special needs diagnoses. R. E. M. B.'s foster family considers her one of their own and intends to adopt her.

In sum, we find no error in the juvenile court's conclusion that clear and convincing evidence supported termination of the mother's parental rights to R. E. M. B.

*Judgment affirmed. Hodges and Watkins, JJ., concur.*

---

[21] (Citations and punctuation omitted.) *In the Interest of B. I. F.*, 264 Ga. App. 777, 781 (2) (592 SE2d 441) (2003).